**Debra HUNTINGTON, Appellant–Plaintiff–Counterdefendant,**

v.

**Tom RIGGS, Rosie Riggs, Tommy Riggs, and Barbara Riggs, Appellees–Defenants–Counterclaimants.**

No. 69A01–0607–CV–318.

Court of Appeals of Indiana.

March 21, 2007.

Maggie L. Smith, Darren A. Craig, Locke Reynolds, LLP, Indianapolis, IN, Attorneys for Appellant.

Larry L. Eaton, Versailles, IN, Attorney for Appellees.

**OPINION**

RILEY, Judge.

*STATEMENT OF THE CASE*

Appellant–Plaintiff, Debra Huntington (Huntington), appeals the trial court's denial of her Motion for Summary Judgment and its grant of Appellees–Defendants', Tom Riggs (Tom), Rosie Riggs, Tommy Riggs, and Barbara Riggs (Barbara) (collectively, the Riggses), Motion for Summary Judgment.

We reverse and enter Summary Judgment in favor of Huntington.

*ISSUES*

Huntington raises three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court erred in denying Huntington's Motion for Summary Judgment claiming that she failed to establish title by acquiescence or by adverse possession over the disputed tract of land; and

(2) Whether the trial court erred in granting the Riggses' Motion for Summary Judgment, thereby quieting title over the disputed tract in favor of the Riggses.

*FACTS AND PROCEDURAL HISTORY*

The case before us involves an ownership dispute over a tract of land in Ripley County, Indiana. In 1947, Charles Hunt-

ington, Huntington's father, purchased property located at 1596 East County Road 450. The property to the east was owned by the Von Groskinsky's, the Riggses' predecessors in title. In approximately 1953, the B & O Railroad bought a right-of-way located between the Huntington and Van Groskinsky properties. Thereafter, the Ripley County Board of Commissioners constructed County Road 150 East on the right-of-way. The road is a thirty foot wide, two lane road located completely on the Von Groskinsky's property and bisects the land from its far northwest corner, almost bordering on the Huntington's property, going in a southeasterly direction.

Prior to the construction of County Road 150 East, the Board of Commissioners published a Notice of Petition for Relocation of County Road, describing the proposed road as "dividing the lands of Charles L. Huntington, et ux. on the west and Joseph Von Groskinsky on the east." (Appellant's App. p. 141). Although the road did not coincide with the boundary line between both properties, following construction in 1954, the Huntingtons and Von Groskinskys appeared to treat the road as marking the border between their two properties. Now, ownership over the northwest corner between the County Road and Huntington's property is disputed. (the Disputed Tract).

Following Charles Huntington's death in 1996, his property passed testate to Robert Huntington, Huntington's brother. In his will, the bequeathed property was described as "my residence and two acre lot at 1596 East County Road 450 N." (Appellant's App. p. 209). Huntington acquired record title to the property from her brother on March 5, 1999, with the deed describing the property as a rectangular tract measuring 100 feet in width by 818 feet, "two (2) acres more or less." (Appellant's App. pp. 213–14).

In 1995, Barbara purchased the Von Groskinsky's property. The survey completed as part of the purchase indicated the Disputed Tract as included in the conveyance. In 2004, Huntington and the Riggses "got into a fight." (Appellant's App. p. 242). As a result of the dispute, Barbara's son, Tom, erected a fence along the outer boundaries of the Disputed Tract. The fence went through the middle of Huntington's driveway and prevented access to County Road 150 East, requiring Huntington to drive through a ditch and preventing delivery of water for a period of time until an alternate route could be constructed.

On November 4, 2004, Huntington filed a Complaint requesting the trial court to quiet title by either acquiescence or adverse possession, in addition to granting a permanent injunction and damages for trespass. On December 20, 2004, the Riggses filed their Answer, along with a Counterclaim asserting quiet title to real estate, damages for trespass, and a permanent injunction. Subsequently, on October 3, 2005, the Riggses sought summary judgment on the allegations raised in their Counterclaim. That same month, on October 31, 2005, Huntington filed her opposition to the Riggses' Motion for Summary Judgment. Contemporaneously, she filed her own Motion for Summary Judgment, together with her designation of evidence. On November 4, 2005, the Riggses filed their Opposition to Huntington's Motion for Summary Judgment and designation of evidence.

On March 24, 2006, the trial court held a hearing on the parties' respective motions for summary judgment. On April 25, 2006, the trial court granted a Partial Summary Judgment in favor of the Riggses on all Counts of their Counterclaim and

denied Huntington's Motion for Summary Judgment. On June 29, 2006, following Huntington's Motion to Correct Error, the trial court stated that its original designation of the judgment as "partial" was incorrect and accordingly revised and reissued its Order for Summary Judgment.

Huntington now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

Huntington contends that the trial court erred in denying her Motion for Summary Judgment and by entering an Order granting the Riggses' Motion for Summary Judgment.

### I. *Standard of Review*

Our standard of review of a summary judgment order is well-settled: summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). Relying on specifically designated evidence, the moving party bears the burden of making a *prima facie* showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Commercial Coin Laundry Sys. v. Enneking*, 766 N.E.2d 433, 438 (Ind.Ct.App.2002). If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. *Id.* A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Id.* Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.*

On appeal, we are bound to the same standard as the trial court, and we consider only those matters which were designated at the summary judgment stage. *Id.* We do not reweigh the evidence, but we liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Id.* A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Id.* at 439. The fact that the parties make cross-motions for summary judgment does not alter our standard of review. *Id.* Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

### II. *Huntington's Motion for Summary Judgment*

On appeal, Huntington contends that the trial court erred in denying her Motion for Summary Judgment. Specifically, Huntington asserts that her designated evidence establishes a *prima facie* case to quiet title to the Disputed Tract both by acquiescence and by adverse possession. Raising both theories of ownership to the land as separate claims, Huntington presents us with support individualized towards each doctrine. On the other hand, although the Riggses failed to separately respond to Huntington's claim of title by acquiescence before the trial court, the Riggses argued during the summary judgment hearing that the doctrine of title by acquiescence was in fact part and parcel of the doctrine of adverse possession and could not be considered as a separate theory of acquiring title over the Disputed Tract. Even though the Riggses on appeal now devote six pages disputing Huntington's quiet title by acquiescence claim, they continue to consider the title by ac-

quiescence and title by adverse possession doctrines as one and the same.

## A. *Title by Acquiescence*

Based on our research, the doctrine of title by acquiescence establishes a theory of acquiring ownership over disputed land that was especially popular during the turn of the century. Our supreme court defined this principle of law in *Adams v. Betz,* 167 Ind. 161, 78 N.E. 649, 652 (1906) (internal citations omitted) as follows:

> As a general rule, it is affirmed by the authorities that where owners of adjoining premises establish by agreement a boundary or dividing line between their lands, take and hold possession of their respective tracts, and improve the same in accordance with such division, each party, in the absence of fraud, will thereafter be estopped from asserting that the line so agreed upon and established is not the true boundary line, although the period of time which has elapsed since such line was established and possession taken is less than the statutory period of limitation. The general rule recognized by the authorities is that a boundary line located under such circumstances, in the absence of fraud, becomes binding on the owners establishing it, not on the principle that the title to the lands can be passed by parol, but for the reason that such owners have agreed permanently upon the limits of their respective premises and have acted in respect to such line, and have been controlled thereby, and therefore will not thereafter be permitted to repudiate their acts.... A valid agreement between owners of land locating a boundary line between them is binding upon each and all persons claiming under or through them, or either of them.

*See also Palmer v. Dosch,* 148 Ind. 10, 47 N.E. 176 (1897); *Dyer v. Eldridge,* 136 Ind. 654, 36 N.E. 522 (1893); *Richwine v.*
*Presbyterian Church,* 135 Ind. 80, 34 N.E. 737 (1893); *Wingler v. Simpson,* 93 Ind. 201, 1884 WL 10332 (1884).

Thirty years later, we reiterated the *Adams* rule in *Bubacz v. Kirk,* 91 Ind.App. 479, 171 N.E. 492 (1930) where, presented with a dispute over real estate, we delved into the historical ownership of the land. Originally, in 1902, Sheerer was the owner of lots 23 and 24, with Johnson owning the adjoining lot 25. *Id.* at 493. As Sheerer contemplated the construction of buildings on lot 24, he notified Johnson that he had a survey made of the boundary line between lots 24 and 25. *Id.* After seeing the survey, both owners agreed that the boundary line between the two lots, as determined by the survey, should be taken as the true and correct boundary. *Id.* Thereafter, Sheerer erected a two-story building on his land. *Id.* In 1920, Kirk became the owner in fee of Sheerer's two lots. 493. Bubacz acquired ownership over lot 25 in 1921. *Id.* at 492. A new survey conducted by the county surveyor disclosed that the dividing line established by the 1902 survey was incorrect and that the south wall of Kirk's building encroached upon lot 25. *Id.* at 494. Although Bubacz, in support of her claim in ejectment, appeared to apply principles of adverse possession, we nevertheless concluded that "we are of the opinion that the facts of this case come within the principle of law announced by the [s]upreme [c]ourt in *Adams v. Betz, . . . ." Id.* Applying the theory of title by acquiescence, we affirmed the trial court and rendered judgment for Kirk. *Id.*

During the forties and fifties when the doctrine of adverse possession became slowly more developed, the doctrine of acquiescence became less frequently used until it disappeared out of the case law altogether in the sixties and seventies. It is not until 1982, that we find a single recurrence of its use. In *Freiburger v.*

*Fry,* 439 N.E.2d 169 (Ind.Ct.App.1982), the Frys asserted both the theories of adverse possession and acquiescence to quiet title over a triangular strip of land dividing the north end of their property from the south end of Freiburgers' land. *Id.* at 171. The trial court ruled in favor of the Frys, finding that the Freiburgers were estopped from denying the Frys' ownership over the land by reason of a boundary line agreement. *Id.* at 172. On appeal, we reached back to our supreme court's opinion in *Adams* and emphasized that "[w]hen adjoining landowners agree to erect a fence as a legal boundary line, they are estopped from denying that this is the legal boundary line." *Id.* While we reiterated the rule proponed in *Adams,* at the same time, we clarified its principles by stating:

> The line agreement need not be express and may be inferred from the parties' actions, but there must be evidence of some agreement as to the boundary line. Use and improvement of the land up to the alleged boundary line may be sufficient to satisfy the requirement of an agreement if the adjoining landowner acquiesces. Ownership of the land in this manner vests in the parties even though the property has not been held for the statutory period required under a theory of adverse possession.

*Id.* at 172–73 (internal citations omitted). Because we affirmed the trial court's Order, quieting title by acquiescence, we concluded that "[i]t is unnecessary to discuss the second issue raised by the Freiburgers regarding the Frys' claim of adverse possession." *Id.* at 173.

■ Most recently, the doctrine of acquiescence was mentioned in dicta in *Piles v. Gosman,* 851 N.E.2d 1009, 1013 n. 2 (Ind.Ct.App.2006). Repeating *Freiburger's* holding, we nonetheless declined to address the principle in light of *Piles'* facts "because our decision is based on Gosman's claim of adverse possession." Consequently, based on century-long case law, we conclude that the doctrine of title by acquiescence is separate and distinct from the theory of adverse possession. The doctrine's legal basis was established by our supreme court in *Adams,* and recently clarified by this court in *Freiburger.* Accordingly, we will avail ourselves of these principles to decide the contention before us.

### B. *Huntington's Designated Evidence*

Huntington's designated evidence discloses that in 1953 the predecessors in title of the adjoining lots, Charles Huntington and Joseph Von Groskinsky, received notice from the Ripley County Board of Commissioners establishing the construction of County Road 150 East as "dividing the lands of Charles L. Huntington, et ux. on the west and Joseph Von Groskinsky on the east." (Appellant's App. p. 141). However, the location of the road failed to follow the strict boundary line between both properties, and instead was built entirely on Groskinsky's land creating a triangle by running from a far northwest corner, almost bordering on Huntington's property, in a southeasterly direction. The evidence further shows that after construction of the road, both families appeared to treat the road as a boundary marker between their properties. Huntington testified that she personally lived on the property from 1957 to 1974. She added that her family used and maintained the Disputed Tract as their own, mowed the usable portion, and built a driveway on the northwest corner of the Disputed Tract. Following Charles Huntington's death in 1996, the Huntingtons' continued to use and occupy the Disputed Tract. The Von Groskinskys never made any claim of interest in the property.

Likewise, in her affidavit, Cleona Sparks, a neighbor to the Huntingtons and Van Grosinskys since 1943, stated that County Road 150 East marked the boundary between the two families' properties. She added that "[i]n the almost 50 years that I have lived at 1431 East County Road 450 North, [ ] and until October or so of 2004, I never knew anyone who lived East of County Road 150 East to claim any property interest in the property immediately West of County Road 150 East." (Appellant's App. pp. 146–47). Furthermore, even though Barbara purchased the Von Groskinsky land in 1995 and her survey completed as part of the purchase identified the Disputed Tract as part of the conveyance, the Huntington family continued to use and occupy the land without interruption by the Riggses until 2004.

## C. *Riggses' Designated Evidence In Response*

 In response to Huntington's evidence, the Riggses choose not to designate any specific evidence, but instead they argued only that the doctrine of title by acquiescence was the same as a claim for adverse possession. However, on appeal, they now dedicate six pages to address the merits of Huntington's acquiescence claim. As we have stated numerous times before, "issues not raised before the trial court on summary judgment cannot be argued for the first time on appeal and are therefore waived." *See, e.g., Dunaway v. Allstate Ins. Co.,* 813 N.E.2d 376, 387 (Ind.Ct.App. 2004).

Even assuming *arguendo* that the Riggses' argument with respect to the theory of title by acquiescence is not waived, the only evidence designated for our review is the evidence relied upon to rebut Huntington's claim for title by adverse possession. In this respect, the Riggses mainly focus our attention on Barbara's affidavit, which states in pertinent part:

4. [Barbara] and her late husband and their predecessors in title paid all of the taxes on the above described real estate.

5. [Barbara] and her late husband and all of their predecessors in title to the above described real estate have exercised exclusive control over the above real estate by a degree in use and control that is normal and customary considering the characteristics of the land; whereas, [Huntington] has exercised no control of the said real estate.

6. [Barbara] and her late husband and all of their predecessors in title to the above described real estate have demonstrated the intent to claim full ownership of the above described real estate superior to the rights of all others; whereas [Huntington] has demonstrated no intent to claim full ownership thereof.

7. [Huntington's] actions with respect to the land were insufficient to give actual or constructive notice to [the Riggs] of [Huntington's] intent and exclusive control of the said real estate.

8. [Huntington] has no evidence each of the above elements continuously for the required ten years.

(Appellant's App. p. 219).

 We note that Barbara's affidavit, while setting forth the legal elements for a claim of adverse possession, *i.e.,* control, intent, notice, and duration, is very limited on specific facts substantiating her legal conclusions. *See Fraley v. Minger,* 829 N.E.2d 476, 486 (Ind.2005). Even though we recognize that Huntington did not object to the admissibility of this affidavit during the summary judgment hearing, we are nevertheless cautious about its substantive relevance pursuant to T.R. 56(E). Trial Rule 56(E) requires that affidavits opposing summary judgment "set forth such facts as would be admissible in evidence...." "Mere assertions of conclu-

sions of law ... in an affidavit will not suffice." *Rubin v. Johnson*, 550 N.E.2d 324, 327 (Ind.Ct.App.1990), *trans. denied.* However, while a trial court's consideration of conclusory statements or matters in affidavits otherwise inadequate under T.R. 56(E) would constitute error, the failure to raise a timely objection constitutes waiver of such claim of error. *Douglas v. Monroe*, 743 N.E.2d 1181, 1187 (Ind.Ct. App.2001). Although Barbara's conclusory statement will thus be considered on appellate review, our inquiry does not end simply because such conclusion recited the appropriate legal standard for a claim of adverse possession. *See id.* As we stated above, a party opposing summary judgment must present us with specific facts showing that there is a genuine issue for trial. Here, we find that Barbara's affidavit fails to include the specific facts supporting her legal assertions.

The Riggses further designate that they are the titleholders of record of the Disputed Land since their purchase of the real estate from the Von Groskinskys in 1995. They also present us with a 1999 court order recording that the will of Charles Huntington described the property as "my residence and two acre lot at 1596 East County Road 450 N." (Appellant's App. p. 209). The court order does not include a legal description of the land.

### D. *Conclusion*

■ In sum, based on the designated evidence before us, we conclude that Huntington presented a *prima facie* showing that there is no genuine issue of material fact. *See Commercial Coin Laundry Sys.,* 766 N.E.2d at 438. We also find that the Riggses failed to designate specific facts establishing a genuine issue for trial. *Id.* Upon receipt of the Ripley County Board Commissioners' notice in 1953 about the impending construction of County Road 150 East, both the Huntingtons and Von Groskinskys actions inferred some agreement with respect to the ownership of the Disputed Land. *See Freiburger,* 439 N.E.2d at 172. For the next forty to fifty years after receipt of the notice, the adjoining landowners acted as if County Road 150 East marked their boundary line, and in effect treated the road as establishing a fence between the two properties. The Huntingtons used and occupied the tract. They improved upon it by mowing the usable portion of the wooded tract, as they did their own yard, and by building a driveway on its northwest corner. No evidence is before us indicating, even in the slightest, that the Von Groskinsky family objected to these actions, either implicitly or expressly.

By the time the Riggses came into possession of the Disputed Land in 1995, the Huntington's had held the track for well beyond the statutory period required under a theory of adverse possession. *See id.* at 173. The evidence designated by the Riggses merely covers the actions undertaken during their conveyance, and not during their predecessor in title. Accordingly, we find that ownership of the land vested by acquiescence in the Huntington family before the Riggses acquired title to the Disputed Tract. Therefore, as this boundary line agreement is not only binding on the original owners but also on their successors in interest, the Riggses are now estopped from disputing Huntington's ownership over the Disputed Land. *See Adams,* 78 N.E. at 652. Thus, we reverse the trial court's Order denying Huntington's motion for summary judgment and enter summary judgment in favor of Huntington quieting her title to the Disputed Land by acquiescence.[1]

---

**1.** Because we reverse the trial court's denial of summary judgment based on the doctrine

## III. *The Riggses' Motion for Summary Judgment*

Next, Huntington contends that the trial court erred by entering summary judgment on the Riggses' counterclaims. Specifically, the trial court established title to the Disputed Land in favor of Barbara based on her acquisition of the property by warranty deed in 1995. We agree.

As we stated previously, under the doctrine of title by acquiescence, the Huntington family acquired the Disputed Land prior to the Riggses' purchase of the Von Grosinsky's property. As this boundary line agreement is not only binding on the original owners but also "upon each and all persons claiming under to through them," the Riggses are estopped from disputing Huntington's ownership over the Disputed Land. *See Adams*, 78 N.E. at 652. Consequently, the trial court erred in entering summary judgment in favor of the Riggses' Counterclaim. Thus, we reverse the trial court's summary judgment in favor of the Riggses.

### CONCLUSION

Based on the foregoing, we conclude that the trial court erred in denying Huntington' Motion for Summary Judgment and in granting Riggses' Motion for Summary Judgment.

Reversed and Summary Judgment entered for Huntington.

KIRSCH, J., concurs.

FRIEDLANDER, J., concurs with separate opinion, in which Judge KIRSCH and Judge RILEY join.

of title by acquiescence, we do not need to address Huntington's second assertion with

FRIEDLANDER, Judge, concurring.

I agree with the majority that summary judgment in favor of the Riggses should be reversed and summary judgment should be entered in favor of Huntington. I write separately to stress the limited and specific applicability of the concept of title by acquiescence, and to underscore the relationship, or lack thereof, of that doctrine to the law of adverse possession. Reduced to its essence, the point I wish to emphasize is that what we are calling "title by acquiescence" applies only in a very narrow set of circumstances, and does not represent an expansion of the doctrine of adverse possession as an alternate means by which one may acquire ownership over property without giving consideration. It is entirely distinct from the doctrine of adverse possession.

According to the lead opinion, "title by acquiescence" is an established "theory of acquiring ownership over disputed land that was especially popular during the turn of the century." *Op.* at 1267. My research indicates that the concept developed in Indiana in the mid-nineteenth century and was especially in vogue in the latter part of that century. *Wingler v. Simpson*, 93 Ind. 201 (1884) is the oldest case cited in the lead opinion that mentioned title by acquiescence. Therefore, it is a good place to start tracing the roots of that concept. In *Wingler*, a dispute developed between adjoining property owners about the location of a property line with respect to a common boundary. At least forty years before suit was filed, the parties' predecessesors in interest had established a lane on what they believed was the property line. The original confusion as to the actual location of the property line was due in large part to the fact that the line

regard to her claim of adverse possession.

was "not one that was established by the congressional surveys, but [was] a subdivision line north and south through the east half of a quarter section." *Id.* at 201. Moreover, the description of the conveyance of land that created the boundary was fairly imprecise by today's standards, utilizing landmarks that might change or disappear over time, *viz.,*

> A certain piece, tract or parcel of land, situate, lying and being in the court of Washington and State of Indiana, and known and described as being part of the east half of the northwest quarter of section seven in township one north, of range four east, in the district of lands offered for sale at Jeffersonville; beginning at the northeast corner of the northwest quarter of section seven in township one north, of range four east, then running south along a marked line to the open line, it is supposed to be about one hundred and sixty rods, thence west with the open line to Godfrey Ratts' corner about fifty rods, then north along a marked line (this is the line in dispute) to Reachart Wilson's corner, near said Viles' spring, thence northeastward to the beginning, the same being forty acres more or less.

*Id.* at 201.

A dispute arose some years later between their successors in interest about the location of the boundary and, as a result, a surveyor was hired. His survey indicated that the true line was located west of the lane. The eastern-most landowner sought a judicial determination that his property extended to the surveyed boundary line, whereas the western-most owner claimed the placement of the lane, and the subsequent long period of using the land consistent with that placement, established the lane as the true boundary.

The Indiana Supreme Court agreed with the latter contention. It began its analysis by invoking terms used in adverse possession cases (i.e., "[t]he admitted evidence complained of is testimony tending to prove that the appellee had held open, notorious and uninterrupted possession, under color and claim of title, to the land in controversy for more than twenty years", *id.*), but, ultimately affirmed the trial court on other grounds. The court ruled that the parties' actions proved that the original establishment of the boundary accurately reflected the intent of the parties in completing the transfer of property. In other words, the establishment and use of the lane for more than twenty years was proof not only of what they originally believed, but also of what they intended, *viz.,*

> Parol evidence is admissible to prove the former existence, identity and location of ancient monuments since removed, such as marked trees and stones, indicative of the location of lines and corners; and we see no reason why the acts of the interested parties, contemporaneous with the alleged existence of the monuments, as tending to prove their existence, should not be also admissible in evidence. If the possession and improvement up to a recognized line for twenty years should not be held conclusive upon the parties, they certainly would have a tendency to prove an implied agreement that should be acquiesced in after that time, or that that was the true line, and would in either event be admissible in evidence, and should be considered by the court or jury in determining whether the survey was correct.

*Id.* Thus, Wingler did not establish a new doctrine that would stand shoulder-to-shoulder with adverse possession as an alternate principle by which real property that is properly titled in one party may pass to another party merely through the latter party's actions. Rather, it merely established that if parties to a land trans-

fer agree that a boundary is in a certain place and both parties use the land consistent with that agreement for a long enough period of time, they cannot later deny the existence of the agreed-upon boundary in lieu of a more favorable placement (from the complaining party's perspective).

Perhaps the best indication of the true nature and application of what we are calling the doctrine of acquiescence is to be found in the oldest Indiana decision I can find on the subject, *Ball v. Cox*, 7 Ind. 453 (1856). In that case, a dispute arose between two adjoining landowners about the location of their mutual property line. I refer the reader to the following diagram in explaining the facts.

Ball had owned his property since approximately 1830, when he and Cox's predecessors in interest purported to equally divide Lots 43 and 44, which originally were divided by an east-west line (represented by dotted line O in the diagram), but in the instant conveyance those two lots were, or at least were described as being, bisected by a line running north and south (see dotted line P). As a result, Ball owned the eastern halves of Lots 43 and 44, and Cox's predecessors owned the western halves. Sometime around 1832, Cox's predecessors built a brick building whose eastern wall extended approximately four feet east across line P. In addition, the predecessors built fences that extended north and south of the east wall of the building, thereby spanning the entire property (represented in the diagram by solid line N). "Ball himself erected a brick building on the east half of lot forty-four, . . . placing his west wall close up to the

east wall of that erected by the grantors of Cox." *Id.* at 453. This was the situation in existence at the time Cox purchased the property from the predecessors, which occurred sometime before 1845.

In 1845, the west end of Cox's building burned. When Cox later began to clear away the debris with a view to rebuilding, Ball sent notice, dated April 15, 1850, that he would engage the services of the county surveyor to "ascertain, establish and perpetuate" the boundary line between them. *Id.* The survey showed that the fences and east wall of Cox's building actually extended approximately four feet across the midline of the two properties (line P). "In April 1850, then, Ball, for the first time, set up a claim to the land i[n] dispute." *Id.* The land in dispute was the roughly four-foot strip depicted as "D" in the diagram. Ball subsequently filed a lawsuit seeking a ruling that he was the owner of

the disputed strip of land. A jury ruled against him and he appealed to the Supreme Court.

The underlying question before the Court was a simple one: which was the boundary between Cox's and Ball's properties—line P, which was the boundary set forth in the legal description of the original conveyance, or line N, which represented the boundary that had, since the beginning, governed the parties' actions and use of their respective properties? Ultimately, the court reversed the jury verdict in favor of Cox, but did so on grounds that the jury was erroneously instructed that the period of acquiescence is eighteen years:

> Upon a careful examination of the case, we can not but regard the weight of authority, and the better reason, with that class of decisions which hold, as a general rule, that twenty years' acquiescence is necessary to support an implied agreement in a boundary variant from that clearly expressed in the title deeds.

*Id.* The court thereby established the twenty-year period necessary to regard the parties' actions and behavior with respect to the land as establishing a boundary line that differs from the one appearing on the conveyance deed. The Court explained, "It would be clearly against the policy both of the statute of frauds and the statute of limitations, to allow a mere intruder, without any claim or color of title, to acquire rights on easier terms than those who hold under an adverse possession." *Id.* The import of this case is that it explains the theory underpinning the determination that a variant boundary established by agreement, as reflected in actions, trumps legal descriptions contained in deeds. That theory is estoppel, i.e., "nothing short of twenty years' acquiescence will *estop* the real owner" from claiming the legal description establishes the true boundary. *Id.* (emphasis supplied).

This brings me to the reason for writing separately. I wish to emphasize my view that acquiescence is not a separate theory for acquiring ownership of another person's real property not by providing compensation, but instead by openly using the land as if her or she was the true owner. It does not stand with the doctrine of adverse possession as an alternate theory to be applied in the same circumstances as adverse possession. Rather, acquiescence applies only when a specific set of circumstances exists—circumstances in which adverse possession does not apply. That set of circumstances is this: Two adjoining property owners (1) share a good-faith belief concerning the location of the common boundary line that separates their properties and, (2) although the agreed-upon location is not in fact the actual boundary, (3) use their properties as if that boundary was the actual boundary (4) for a period of at least twenty years. It is the original *agreement* between the adjoining owners that takes this and all other "acquiescence" cases out of the realm of adverse possession.

The doctrine of acquiescence has lain largely dormant in real estate litigation since the end of the nineteenth century, and understandably so, given not only the very narrow set of circumstances in which the doctrine may be invoked, but also the continuing evolution of land surveying, legal descriptions of property, and recording real estate transactions. It is my hope that these comments will prolong that slumber.