# FOR PUBLICATION

ATTORNEY FOR APPELLANTS:

**JON P. MCCARTY**
Covington, Indiana

ATTORNEY FOR APPELLEES:

**JILL D. WESCH**
Wallace Law Firm
Covington, Indiana



FILED
Nov 20 2013, 9:56 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CLIFFORD AND JUDITH ANN GARRETT, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| vs. | ) | No. 23A01-1303-PL-96 |
| | ) | |
| PAUL AND LINDA SPEAR, | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE FOUNTAIN CIRCUIT COURT
The Honorable Susan Orr Henderson, Judge
Cause No. 23C01-1008-PL-339

**November 20, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Clifford and Judith Ann Garrett (collectively, the "Garretts") appeal from the trial court's grant of summary judgment in favor of Paul and Linda Spear (collectively, the "Spears"). The Garretts raise two issues which we consolidate and restate as whether the court erred in granting summary judgment in favor of the Spears and denying their own summary judgment motion. We affirm.

FACTS AND PROCEDURAL HISTORY

As revealed by the designated evidence, the parties own adjacent parcels of land. The Spears own property known as 302 S. Range Street in Newtown, Indiana (the "Spear Property"), and the Garretts own property situated to the south of the Spear Property and known as 314 S. Range Street, Newtown, Indiana (the "Garrett Property"). The Spears purchased the Spear Property in December of 1978 and have occupied it since that time, and the Garretts purchased the Garrett Property from Georgia Gillis in 1986 pursuant to a contract for sale of real estate and took possession at that time.[1] At the time Georgia was married to Don Gillis and had purchased the Garrett Property on March 21, 1983 from Ruth Pevler.[2] Neither the Spears nor the Garretts had a survey performed at the time they purchased their respective properties.

---

[1] Specifically, the Garretts entered into a contract with Georgia Gillis to purchase the property on April 7, 1986. In December of 1994, Georgia filed a complaint to foreclose upon the Garrett Property, stating that the Garretts had not made payment since August of that year and still owed $43,000 on the contract. On February 8, 1995, the Fountain Circuit Court entered a finding and judgment foreclosing the Garretts' interest and claim in the Garrett Property. On March 23, 1995, the Garretts filed a notice of bankruptcy in the Fountain Circuit Court stating that Clifford had filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code on March 6, 1995. On September 28, 1995, the bankruptcy court lifted the stay against Georgia's foreclosure action. On November 18, 1995, Georgia conveyed the Garrett Property by warranty deed to the Garretts for the sum of $1.00.

[2] Georgia Gillis died in 2002. Don Gillis is not named on the warranty deeds conveying the Garrett Property from Ruth Pevler to Georgia Gillis or conveying the Garrett Property from Georgia Gillis to the Garretts. The Spears acknowledge that Don Gillis "was not a legal title holder to the Garrett

2

At the time the Garretts purchased the Garrett Property from Georgia Gillis, there was fencing that existed separating the Garrett Property and the Spear Property, and at some point after the year 2000 the fencing was torn down by the Garretts. Also, in 1996 the Spears erected a garage and installed a driveway on what they believed to be their property. In or about 2010, the Garretts had a survey done of the Garrett Property. The survey revealed that the actual boundary between the Garrett Property and the Spear Property (the "Surveyed Boundary") was north of where the fence line had existed ("Fence Line Boundary"). The survey also showed that the garage erected by the Spears encroaches upon the Surveyed Boundary for the Garrett Property but is within the Spear Property based upon the Fence Line Boundary. Thereafter, the Garretts erected a cattle fence along the Surveyed Boundary which runs to the south edge of the Spears' garage.

On August 10, 2010, the Spears filed a complaint against the Garretts alleging Count I, quiet title by the doctrine of title by acquiescence; Count II, quiet title by adverse possession; Count III, prescriptive easement; and Count IV, trespass to land. In Count I, the Spears' complaint alleged that, in or around the spring of 1983, the Spears entered into an agreement with Georgia Gillis regarding the boundary between the Garrett Property and the Spear Property, specifically determining that such boundary would be one-and-a-half feet north of the then-existing fence that separated the two properties (i.e., the Fence Line Boundary). The complaint stated that the Surveyed Boundary between the two properties is approximately twelve feet north of the Fence Line Boundary, and it alleged that the Spears, having "occupied, maintained and used the approximate twelve

Property at any time." Appellees' Brief at 11 n.2.

3

(12) foot strip as their property for over twenty seven (27) years by agreement and acquiescence of Gillis and her successor's [sic] in interest, the [Garretts]," are "entitled to quiet title to them with respect to that approximate twelve (12) foot strip of real estate . . . ." Appellants' Appendix at 11-12. The complaint also indicated that in 1996 the Spears erected a garage and installed a driveway situated within the Fence Line Boundary, based upon the "implied understanding of the boundary between the two properties" and "in good faith and with full knowledge" of the Garretts. Id. at 10. On September 30, 2010, the Garretts filed their answer, affirmative defenses and counterclaims alleging five counts including Count I, to quiet title; Count II, trespass; Count III, ejectment; Count IV, trespass; and Count V, nuisance.

In the ensuing months, depositions were taken of Don Gillis, Clifford Garrett, Judith Garrett, and Paul Spear. Don Gillis testified in his deposition, given on October 29, 2010, that as far as maintaining the outside of the property, "[a]nything outside[, Georgia] left it up to me." Id. at 65. When asked about the boundary between the Garrett Property and the Spear Property, Don testified that "there's a stake in the ground and we come straight down from the fence back there in the rear all the way straight down" and that the stake was "about a foot and a half over to [his] side of the fence…where the fence used to be." Id. at 66. Specifically, Don stated that soon after he and Georgia moved onto the Garrett Property he installed a metal fence which he connected to another fence located at the western edge of both properties, which other fence had been installed prior to the Gillises living on the property. He also installed a second, wooden fence at the same time which "went right straight down the line" to the

4

road from the same "fence that existed." Id. at 68. Don testified that the fence was "meant to be the separating point" between the two properties. Id.

Don testified that he mowed the south side of the fence and Linda Spear "put flowers . . . and stuff" on the north side of it. Id. at 70. Don also indicated that after installing the fence neither he nor Georgia did "anything" or conducted any activity on the north side of the fence. Id. at 71. On cross-examination, Don admitted that he did not "really remember" where the fence had been located. Id. at 79. Don stated that around the time they purchased the Garrett Property Georgia "handled all the paperwork. I did the outside, the painting and everything else. She handled the paperwork. The bills and all."[3] Id. at 90.

In his deposition Clifford Garrett testified that there had been a "redwood fence" between the two parcels, that it was on the Spear Property and the Spears maintained both sides of it, and that he did not recall a "wire fence." Id. at 105. Clifford stated that he removed the wooden redwood fence and that he did not recall when that occurred. He further testified that he installed a metal "cattle fence" at some point, that he did not recall when that occurred, and that he took it down at one point and similarly did not recall when, or why, he did so. Id. at 107.

Clifford also testified that he discussed the boundary of the Garrett Property with Georgia Gillis at the time of purchase. He indicated that Georgia told him the boundary was four to five feet north of the redwood fence, and that the fence was installed in such a

_____

[3] When presented with a photograph depicting the disputed boundary area between the properties as it currently existed and asked to mark where the fence used to be, Don stated that "[t]he son-of-a-bitch tore it out is what he did," and later noted that he was referring to Clifford Garrett. Appellants' Appendix at 74. Don also stated that he did not like Clifford, that he would like to see the Spears win the case, that Clifford was not an honest person, and that "[i]f it was me [the] son-of-a-bitch would be dead." Id. at 92.

5

way so that they could maintain the fence and paint it. Clifford testified that both his wife and Linda Spear tended to the flowers around the fence, and also that both the Garretts and the Spears would mow the grass on both sides of the fence. He also stated that Plaintiffs' Exhibit 3, a picture depicting vegetation where the flower beds had been, did not represent a line where the metal fence had been, and that the metal fence had been approximately four feet north of the line of vegetation. Regarding the garage built by the Spears, Clifford acknowledged that he did nothing to prevent them from erecting it at the time, noting that he believed that the garage may have encroached upon his land, but chose not to try to stop the construction because he didn't think he had "that kind of authority." Id. at 113.

Judith Garrett testified in her deposition that there were two fences in existence when they first moved onto the property, including a metal fence and a redwood fence. She testified that Georgia told them that the property line was north of the wooden fence because "she wanted to be able to maintain, paint. They even put brick on both sides for flower beds which were there so they had plenty of room to mow . . . ." Id. at 126. She stated that Georgia and Don Gillis walked the Garretts around the property when it was purchased and pointed out "corner posts" and a "metal stake" as setting the border for the property, and she acknowledged that neither Georgia Gillis nor Don Gillis indicated in actual feet or inches where the border of the Garrett Property was in relation to the fence.

Judith testified that the old cattle fence existed down the line where vegetation is currently planted as depicted in Plaintiffs' Exhibit 3. She also testified that she planted flowers only on the south side of the fence and never did any landscaping on the north

6

side. She stated that she and Clifford, with the help of a few others, removed both a metal fence and the wooden redwood fence at some point after the year 2000. She also indicated that she never tried to stop the Spears from constructing the garage because the Garretts and the Spears "were neighbors and friends at the time." Id. at 128.

Paul Spear testified in his deposition that, after Don erected the fencing in 1983, "the agreed upon line between me and Don Gillis was a foot and a half north of the fence." Id. at 138. Paul indicated that he assisted Don in erecting the fence and, when they finished, Don told him "that they'd had it surveyed . . . and that it was a foot and a half north of the fence . . . ." Id. Paul also testified that there were only two fences that had been erected on the property – the one he and Don had put up in 1983 and the current cattle fence that runs up to the Spears' garage. Paul stated that Don wanted to leave a foot and a half north of the fence in order to maintain both sides of the fence, and that he never observed the Garretts maintaining property north of the vegetation until after they had a survey done in 2010. Paul indicated that he did not speak with Georgia about the property line but that she "didn't object to what we agreed on." Id. at 143. He also testified that the Garretts never mowed north of where the fence existed until after the 2010 survey and that the fence had been located down the line of vegetation as depicted in Plaintiffs' Exhibit 3.

On July 2012, the Spears filed a motion for summary judgment on their claims of title by acquiescence and adverse possession, and a memorandum in support and designation of evidence. On September 4, 2012 the Garretts filed their cross-motion partial for summary judgment, their response in opposition to the Spears' summary

7

judgment motion, memorandum in support, and designation of evidence. As part of their designated evidence, the Garretts attached declarations of Clifford and Judith. In Clifford's declaration, he stated that Georgia Gillis had walked him around the property indicating that the northern boundary of the Garrett Property was where the southern edge of the Spears' driveway now exists.

Judith stated in her declaration that a telephone pole, which existed at the time they took possession of their property in 1986 and still exists, is situated north of and near the Fence Line Boundary. She stated that at some point in or around 1996, she spoke to Paul concerning a security light attached to the telephone pole, specifically concerning trees which were growing into the light and could potentially cause a fire. Judith stated that Paul told her that "the telephone pole and light were [the Garretts'] problem because they were on [the Garretts'] property." Id. at 199. She also stated that the Garretts thereafter had the security light removed from the telephone pole, and removed the trees from around the pole to prevent further problems. Paul had indicated in his deposition, however, that no such conversation ever took place.

On February 6, 2013, the trial court entered its order granting summary judgment in favor of the Spears and against the Garretts (the "Order"). The Order stated that "[t]he court's ruling is controlled by the doctrine of acquiescence and as such does not address the remaining theories of recovery espoused by [the Spears]." Id. at 8. The court ordered the Spears to "obtain and properly record a survey reflecting the boundary line that has been in existence since 1983 along the fence line by agreement between the Gillises' and Spears' property." Id. The court also ordered the Garretts to "remove any fence installed

8

along said boundary that is now not compliant with this ruling" and gave the parties ninety days to comply. <u>Id.</u>

ISSUE / STANDARD OF REVIEW

When a trial court's ruling granting or denying summary judgment is challenged on appeal, the procedure and standard under Indiana law is clear. Our standard of review is the same as it is for the trial court. <u>Manley v. Sherer</u>, 992 N.E.2d 670, 673 (Ind. 2013) (citing <u>Kroger Co. v. Plonski</u>, 930 N.E.2d 1, 4 (Ind. 2010)). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." <u>Id.</u> (quoting <u>Gill v. Evansville Sheet Metal Works, Inc.</u>, 970 N.E.2d 633, 637 (Ind. 2012)). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the non-moving party must come forward with evidence establishing the existence of a genuine issue of material fact. <u>Id.</u> We construe all factual inferences in favor of the non-moving party and resolve all doubts as to the existence of a material issue against the moving party. <u>Id.</u> An appellate court reviewing a challenged trial court summary judgment ruling is limited to the designated evidence before the trial court, <u>see</u> Ind. Trial Rule 56(H), but is constrained to neither the claims and arguments presented at trial nor the rationale of the trial court ruling. <u>Manley</u>, 992 N.E.2d at 673.

The fact that the parties make cross-motions for summary judgment does not alter our standard of review. <u>Huntington v. Riggs</u>, 862 N.E.2d 1263, 1266 (Ind. Ct. App. 2007), <u>trans. denied</u>. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. <u>Id.</u>

9

DISCUSSION

The trial court granted summary judgment in favor of the Spears based upon the doctrine of title by acquiescence. This court has previously recognized that this doctrine is a theory of acquiring ownership over a disputed parcel of land which was popular at the turn of the twentieth century.[4] Id. at 1267. The Indiana Supreme Court defined the doctrine as follows:

> As a general rule, it is affirmed by the authorities that where owners of adjoining premises establish by agreement a boundary or dividing line between their lands, take and hold possession of their respective tracts, and improve the same in accordance with such division, each party, in the absence of fraud, will thereafter be estopped from asserting that the line so agreed upon and established is not the true boundary line, although the period of time which has elapsed since such line was established and possession taken is less than the statutory period of limitation. The general rule recognized by the authorities is that a boundary line located under such circumstances, in the absence of fraud, becomes binding on the owners establishing it, not on the principle that the title to the lands can be passed by parol, but for the reason that such owners have agreed permanently upon the limits of their respective premises and have acted in respect to such line, and have been controlled thereby, and therefore will not thereafter be permitted to repudiate their acts. . . . A valid agreement between owners of land locating a boundary line between them is binding upon each and all persons claiming under or through them, or either of them.

Id. (quoting Adams v. Betz, 167 Ind. 161, 169-170, 78 N.E. 649, 652 (1906) (internal citations omitted)).

This court further addressed the doctrine of title by acquiescence in Freiburger v. Fry, 439 N.E.2d 169 (Ind. Ct. App. 1982), in which we held that "the Freiburgers were estopped from denying the Frys' ownership over the land by reason of a boundary line

---

[4] We have observed that by "the forties and fifties when the doctrine of adverse possession became slowly more developed, the doctrine of acquiescence became less frequently used until it disappeared out of the case law altogether in the sixties and seventies," until 1982 in the case of Freiburger v. Fry, 439 N.E.2d 169 (Ind. Ct. App. 1982). Huntington, 862 N.E.2d at 1267-1268.

10

agreement." Huntington, 862 N.E.2d at 1268 (citing Freiburger, 439 N.E.2d at 172). In so holding, this court clarified the doctrine as follows:

> The line agreement need not be express and may be inferred from the parties' actions, but there must be evidence of some agreement as to the boundary line. Use and improvement of the land up to the alleged boundary line may be sufficient to satisfy the requirement of an agreement if the adjoining landowner acquiesces. Ownership of the land in this manner vests in the parties even though the property has not been held for the statutory period required under a theory of adverse possession.

Id. (quoting Freiburger, 439 N.E.2d at 172-173).

Judge Friedlander authored a concurring opinion in Huntington, which was joined by the other two judges on the panel, in order "to stress the limited and specific applicability of the concept of title by acquiescence, and to underscore the relationship, or lack thereof, of that doctrine to the law of adverse possession." Id. at 1271 (Friedlander, J., concurring). In his concurrence, Judge Friedlander discussed the case of Wingler v. Simpson, 93 Ind. 201 (1884), in which the Indiana Supreme Court invoked the doctrine of title by acquiescence, ruling "that the parties' actions proved that the original establishment of the boundary accurately reflected the intent of the parties in completing the transfer of property." Id. at 1272. In so holding, the Wingler Court underscored the policy of the doctrine, stating:

> Parol evidence is admissible to prove the former existence, identity and location of ancient monuments since removed, such as marked trees and stones, indicative of the location of lines and corners; and we see no reason why the acts of the interested parties, contemporaneous with the alleged existence of the monuments, as tending to prove their existence, should not be also admissible in evidence. If the possession and improvement up to a recognized line for twenty years should not be held conclusive upon the parties, they certainly would have a tendency to prove an implied agreement that should be acquiesced in after that time, or that that was the true line, and would in either event be admissible in evidence, and should

11

be considered by the court or jury in determining whether the survey was correct.

Id. (quoting Wingler, 93 Ind. at 201). Based upon the Court's reasoning, Judge Friedlander observed that Wingler:

> did not establish a new doctrine that would stand shoulder-to-shoulder with adverse possession as an alternate principle by which real property that is properly titled in one party may pass to another party merely through the latter party's actions. Rather, it merely established that if parties to a land transfer agree that a boundary is in a certain place and both parties use the land consistent with that agreement for a long enough period of time, they cannot later deny the existence of the agreed-upon boundary in lieu of a more favorable placement (from the complaining party's perspective).

Id. at 1272-1273.

After discussing another case from the Indiana Supreme Court, Ball v. Cox, 7 Ind. 453 (1856), which Judge Friedlander identified as "the oldest Indiana decision I can find on the subject," id. at 1273, he underscored that "acquiescence is not a separate theory for acquiring ownership of another person's real property not by providing compensation," and "[i]t does not stand with the doctrine of adverse possession as an alternate theory to be applied in the same circumstances as adverse possession." Id. at 1274. He then identified the following analysis and test:

> Rather, acquiescence applies only when a specific set of circumstances exists—circumstances in which adverse possession does not apply. That set of circumstances is this: Two adjoining property owners (1) share a good-faith belief concerning the location of the common boundary line that separates their properties and, (2) although the agreed-upon location is not in fact the actual boundary, (3) use their properties as if that boundary was the actual boundary (4) for a period of at least twenty years. It is the original agreement between the adjoining owners that takes this and all other "acquiescence" cases out of the realm of adverse possession.

Id.

12

The Garretts argue that the Spears failed to produce evidence of any agreement between them and Georgia Gillis, the owner of the Garrett Property prior to the Garretts, and instead "relied exclusively on the purported agreement between Mr. Spear and Mr. Gillis." Appellants' Brief at 10. The Garretts argue that "allowing agreements between non-owners to support a claim for acquiescence could potentially open the door for mere tenants to make such agreements that would bind unsuspecting purchasers . . . ." Id. They contend that "[t]he undisputed record evidence also showed that three years after . . . the alleged agreement . . . the Garretts took possession of the property . . . and thereafter routinely cared for and maintained the land the Spears seek to acquire by acquiescence, and removed the fence separating the properties." Id. at 11. Accordingly, they posit that summary judgment should have been entered in *their* favor, noting that "a claim for acquiescence requires . . . use by said landowners . . . as if that boundary was the actual boundary 'for a period of at least twenty years.'" Id. (quoting Huntington, 862 N.E.2d at 1274). The Garretts also argue that "[a]t a minimum, there existed disputed issues of material fact that precluded the entry of summary judgment in favor of the Spears," including the existence of an agreement between Mr. Gillis and the Spears and the location of "the alleged 'new' boundary." Id. at 12. Finally, the Garretts argue that the court erred in not granting their summary judgment motion on the Spears' adverse possession claim, noting that the record "contains no evidence . . . that the Spears exercised or intended to exercise exclusive possession over the Garretts' property" or that

the Spears "paid, intended to pay, or believed that they were paying, the taxes on the disputed tract."[5] Id. at 13-14.

The Spears argue that Don testified that "he was basically in charge of the decisions regarding the outside premises, including erecting a metal fence in 1983 . . . with the help of Paul Spear," that Paul and Don "agreed that the metal fence they erected would be used to locate the boundary between the two tracts as being one and one half feet north of the metal fence," and that "title by acquiescence was complete at the time of the erection of the fence in 1983." Appellees' Brief at 11-12. The Spears assert that a boundary line agreement pursuant to the doctrine of title by acquiescence may be inferred from the party's actions, and "[t]he use and improvement of the land by the Spears and the Gillises up to the metal fence line subsequent to the erection of the fence may be sufficient to satisfy the requirement of an agreement with Georgia . . . if she is

_____

[5] In the facts section of their brief, the Garretts note that Georgia Gillis "filed a complaint against the Garretts in the Fountain Circuit Court for non-payment on the Contract" and, in that filing, "made no allegations that the Garretts had purchased . . . less than the entirety of the property described in the deed she provided the Garretts, or that she had entered into an agreement with the Spears concerning the Northern boundary of the property prior to selling it to the Garretts." Appellants' Brief at 4-5. The Garretts also note that the court ruled in favor of Georgia and, in so doing, found that the Garretts had purchased the entirety of the Garrett Property. They further note that the bankruptcy court, in lifting the stay in favor or Georgia, "described the entirety of the property described in the deed Ms. Gillis provided the Garretts" and "made no mention of an agreement between Ms. Gillis and the Spears, or that the Northern boundary of the Garrett Property was different from the property description in the deed Ms. Gillis provided the Garretts." Id. at 5. Based upon such facts, the Garretts argue that when Georgia filed suit to have the Garretts ejected for nonpayment and to foreclose, "[s]he made no allegations that she sold the Garretts less [than] the entirety of said property" and "[s]urely she would not have misrepresented the nature of the purchase to the circuit court, or to the Bankruptcy Court thereafter, if there existed an agreement regarding a 'new' boundary as the Spears claim." Id. at 11.

We are not persuaded by the Garretts' argument. As noted above, the doctrine of title by acquiescence is invoked under circumstances in which two property owners share a good faith belief and agree on where the boundary between their parcels lies, which turns out to be inaccurate, for a period of at least twenty years, and that the property owners use that boundary as if it is the actual boundary. Thus, the agreed-upon boundary for acquiescence purposes is based upon a *misunderstanding* by the property owners, rather than an attempt by the property owners to *change* the boundary between the parcels by an agreement based upon full knowledge of where the true boundary lies.

determined by her actions or inactions to acquiesce in the agreement," noting also that the Garretts failed to show any evidence that Georgia ever disagreed with this new boundary or acted in contravention of it. Id. at 12. The Spears also maintain that after the Garretts took possession of the property, they voluntarily left the metal fence up until sometime after the year 2000, and while they contend "that they believed the true boundary to be much farther north of the existing fence, they did nothing to assert their perceived rights to the real estate north of the fence until the filing of this action in 2010 . . . ." Id. at 13. The Spears highlight that "the Garretts did absolutely nothing to ascertain the location of the true boundary or to stop the construction [of the Spears' garage in 1996] and essentially acquiesced in the location of the garage until the survey and lawsuit in 2010." Id. at 14. Finally, the Spears quote that "equity aids the vigilant, not those who slumber on their rights." Id. (citing Citizens Nat. Bank v. Judy, 43 N.E. 259, 263 (Ind. 1896)).

## DECISION

Initially, we observe that to the extent the Garretts challenge the court's grant of summary judgment based upon the fact that it was Don Gillis who erected the fence in 1983 and discussed with Paul Spear that the boundary was one and a half feet north of such fence, we disagree with that challenge. Even assuming that Don Gillis, who was married to Georgia Gillis at the time Georgia became the title holder to the Garrett Property, is not considered a "property owner" for acquiescence purposes, it is undisputed that Georgia did not take issue with the installation of the fence by her husband. As noted above, acquiescence "need not be express and may be inferred from the parties' actions." Huntington, 862 N.E.2d at 1268. Under the circumstances, in

15

which Don, the member of the Gillis household who maintained the outdoor areas of the property and was married to Georgia, the title holder, constructed a fence and came to an agreement with Paul Spear as to where the boundary of between the parcels was, we find that such agreement was sufficient to invoke the doctrine of title by acquiescence.[6]

We next find that the Fence Line Boundary has been established as the boundary between the Garrett Property and the Spear Property by the doctrine of title by acquiescence. It is undisputed that fencing was erected in 1983 and that, in the ensuing years, this fence operated as a boundary between the two parcels. The Spears, in 1996, built a garage and driveway based upon this boundary, and such was not challenged by the Garretts until 2010, or twenty-seven years following the installation of the fencing. Members of both households testified at their depositions that this fencing, which the Garretts removed sometime following the year 2000, existed down a line of vegetation which currently exists and is memorialized by photographs contained in the designated evidence, including Plaintiffs' Exhibit 3. Judith Garrett stated at her deposition that during the existence of the fence, she planted flowers only on the south side of the fence and never did any landscaping on the north side of the fence. Paul stated that the Garretts did not maintain the property north of the vegetation until after the 2010 survey. Despite the fact that Paul and Clifford disagree about whether the Garretts mowed the grass north of the fence during the fence's existence, we do not find that this fact alone establishes a

---

[6] We are not persuaded by the Garretts' argument that "allowing agreements between non-owners to support a claim for acquiescence could potentially open the door for mere tenants to make such agreements that would bind unsuspecting purchasers," Appellants' Brief at 10, under the circumstances presented by this case. Don Gillis was married to Georgia Gillis, the title holder, and Georgia lived on the property in which the fence was constructed. Also, following its construction, neither Don nor Georgia did "anything" or conduct any activity on the north side of the fence. Transcript at 71.

genuine issue of material fact as to whether the Fence Line Boundary was accepted as the boundary between the parcels until 2010, in light of the totality of the designated evidence, including, notably, the placement of the Spears' garage and driveway.

As the Indiana Supreme Court held in Adams, "where owners of adjoining premises establish by agreement a boundary . . . *and improve the same in accordance with such division*, each party, in the absence of fraud, will thereafter be estopped from asserting that the line so agreed upon and established is not the true boundary line . . . ." 167 Ind. at 169-170, 78 N.E. at 652 (emphasis added). We find, based upon the designated evidence, that this is precisely what took place. Accordingly, we conclude that the court did not err in granting summary judgment to the Spears based upon the doctrine of title by acquiescence.[7] See also Roberts v. Feitz, 933 N.E.2d 466, 484 (Ind. Ct. App. 2010) (holding that "[t]he Feitzes acted in reliance on Papczynicski's acquiescence of the boundary line and as a result, they made improvements to the land," and that, accordingly, "[b]ecause Papczynicski agreed on the boundary line between his property and what would become the Feitzes property, that agreement is binding on the Roberts and all others who subsequently acquire the land from them").

## CONCLUSION

For the foregoing reasons, we affirm the trial court's grant of summary judgment in favor of the Spears and against the Garretts.[8]

---

[7] We note that the trial court ordered the Spears to "obtain and properly record a survey reflecting the boundary line that has been in existence since 1983 along the fence line installed by agreement . . . ." Appellants' Appendix at 8. We wish to clarify that, based upon the designated evidence, such boundary shall be one-and-one-half feet to the north of the fence line.

[8] We note that because we affirm the court's order on summary judgment, we need not address

17

Affirmed.

NAJAM, J., and MATHIAS, J., concur.

---

the Garretts' arguments regarding the Spears' adverse possession claim.