STATE of Indiana, Appellant–Plaintiff,

v.

Jeanette SEROWIECKI, Appellee–Defendant.

No. 56A04–0710–CV–576.

Court of Appeals of Indiana.

Aug. 21, 2008.

Steve Carter, Attorney General of
Indiana, Frances Barrow, Deputy Attor-

ney General, Indianapolis, IN, Attorney for Appellant.

Daniel C. Blaney, Blaney & Walton, Jeffrey D. Drinski, Blaney & Walton, Morocco, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

The State of Indiana appeals the trial court's grant of summary judgment in favor of Jeanette Serowiecki, as Trustee under the provisions of the Louise Sikora Declaration of Trust dated July 30, 1984, (the Trustee) on the State's complaint to quiet title to an 18.6–acre tract of land in Newton County. On appeal, the State presents three issues for our review:

1. Did the State acquire legal title to the disputed property based on the existence of a fence along a ditch and the long-time assumption that the ditch and fence represented the true boundary line?

2. Did the State acquire title to the disputed property through adverse possession?

3. Did the State acquire title to the disputed property under the doctrine of title by acquiescence?

We affirm.

In 1945, the Indiana Department of Conservation, Division of Fish and Game, now known as the Department of Natural Resources (DNR), acquired land in Newton County. The property is known as the Beaver Lake Prairie Chicken Refuge. The property is described in the Warranty Deed as follows:

The northwest quarter (¼) of Section two (2); the west half (½) of the northeast quarter (¼) of Section two (2); the southeast quarter (¼) of the northeast quarter (¼) of Section two (2); all in Township thirty (30) north, Range nine (9) west;

Also the southwest quarter (¼) of the southwest quarter (¼) of Section thirty-five (35), Township thirty-one (31) north, Range nine (9) west;

Also the south half (½) of Section two (2), Township thirty (30) north, Range nine (9) west, containing in all approximately six hundred forty (640) acres, more or less.

*Appellant's Appendix* at 95. Much of this land had originally been under a lake, and the original government survey depicts only the northern part of the eastern boundary line with the southern part extending into the lake. Sometime thereafter, the lake was drained. In the 1930s, a ditch was built at an angle, beginning at the northeast corner of Section Two and moving southeast until it intersects with the southern boundary line of Section One.[1] A fence was erected closely paralleling the ditch.[2] The fence extends northward along the west top of the bank of the ditch and southward through the center of the ditch.[3] The DNR assumed the ditch and fence to be the eastern boundary line of its property. Hereinafter, we will refer to the DNR's property as Section Two.

On March 5, 1951, Nicholas Sikora and his wife, Louise R. Sikora, acquired 360 acres in Newton County which adjoin Section Two to the east. The Sikoras' land is

1. The ditch was apparently dug by Prudential Insurance Company, which previously owned the portion of Section One that is now identified as the Nature Conservancy.

2. It is unclear whether the fence was in place when the DNR acquired the land or whether the DNR was responsible for erecting the fence along the ditch after the land was acquired.

3. Apparently, the fence has not been maintained and is in extreme disrepair.

described as: "The Southeast quarter (SE ¼) of the Northeast quarter (NE¼) of Section One (1), and the South one-half (S½) of Section One (1), all in Township Thirty (30) North, Range Nine (9) West of the Second Principal Meridian...." *Id.* at 17. On February 16, 1993, Mrs. Sikora quitclaimed this land to the Trustee. Mrs. Sikora believed the common boundary line between Sections One and Two was a straight north-south line. Hereinafter, we will refer to the Sikora property as Section One.

The disputed tract of land, therefore, is a wedge that has its western boundary being a straight north-south line between Sections One and Two (the property line according to Mrs. Sikora) and its eastern boundary being an angled line, running from northwest to the southeast along the ditch, and ending on the southern boundary line of Section One (the property line according to the State). *See* Figure 1. In total, the disputed tract is approximately 18.6 acres of non-tillable ground that serves as a natural habitat.

Figure 1 (*Appellant's Appendix* at 29, in relevant part).

On November 27, 1996, Mrs. Sikora sent a letter to the DNR disputing the location of the shared property line as depicted in the 1994 Newton County Plat Book. The 1994 plat map shows a solid, slanted line that Mrs. Sikora claimed was encroaching on Section One. *See* Figure 1. Mrs. Sikora assumed this line represented the property line and suggested that the property line was "arbitrarily changed because of the striking demarcation line shown on aerial photographs" and because of the misplacement by the DNR of a fence and warning sign posts placed on her property. *Appellant's Appendix* at 20. Attached to her letter were copies of maps that Mrs. Sikora referred to as coming from "old plat books (not necessarily as legal as the books at the auditor's office)" that depict Sections One and Two as having perpendicular corners, i.e., the property line between Sections One and Two is a straight, north-south line. *Id.* Mrs. Sikora also submitted her county tax assessment demonstrating that she was being taxed on 360

acres of land (which includes the disputed tract).

By letter dated January 8, 1997, DNR's Director of Land Acquisition, John Davis, responded to Mrs. Sikora's letter as follows:

> I have received your letter of November 29, 1996 in which you point out that you disagree as to the location of the property line shared by your land and land of the State. I spoke to Mr. Marlow Davis of the Newton County Surveyor's Office on Jan. 7. It appears that the section line between Sections 1 and 2 has not been established by the County. In order to establish the correct location of the Section line a "legal survey" would need to be performed by a registered land surveyor. The County Surveyor is not able to perform this task.
>
> The lines of occupation seem well established in this instance. The IDNR has owned and operated this property since 1946[sic]. If you feel that a survey would reveal a different location of the property line than that which has been in use for the past 50 years, I would suggest that you have a Registered Land Surveyor delineate the section line in question.
>
> I believe that the County Auditor may be able to offer you guidance on what procedure you must follow to reduce the amount of acreage on which you are being taxed. You may be eligible for some partial refund of taxes paid erroneously.

*Id.* at 19.

Mrs. Sikora commissioned a survey of her property that was completed on February 1, 2000. This survey shows a straight north-south boundary line between Sections One and Two. The DNR commissioned a survey in 2007. This survey also showed a straight north-south boundary line between Sections One and Two, but also indicated a line where a broken down fence angled southeast into Section One. The 2007 surveyor's report noted the following with respect to the history of the disputed area:

> Historically, this area was covered by an approximately 17,000 acre lake called Beaver Lake.... The original government surveys (for the Public Land Survey System (PLSS)) that came thru to lay off this land only ran the north 10.90 chains of the east line of Section 2 in this area because that line extending south entered Beaver Lake.
>
> During the time that Newton County was still part of Jasper County, Michael G. Bright purchased all of this land, including the drained Beaver Lake and he platted this area as "Plat of Beaver Lake" recorded October, 1857.... After Newton County split off from Jasper County, this Plat was recorded ... in 1859 in the Newton County Recorders Office. Those plats indicate that all the sections involved were laid off in 40 acre tracts. Each 40 acre tract being numbered.

*Id.* at 83.

On July 6, 2006, the State filed a complaint to quiet title to the disputed tract of land. On July 27, 2006, the Trustee filed an answer and also filed a counter-claim for inverse condemnation. The State filed its answer to the counter-claim on August 1, 2006. On April 16, 2007, the State filed a motion for summary judgment, and the Trustee responded on June 4, 2007. The trial court heard argument on the State's motion on June 18, 2007. On August 3, 2007, the trial court entered an order granting summary judgment in favor of the Trustee. The trial court concluded that the State never acquired legal title to the disputed property and did not acquire the property through inverse condemna-

tion or adverse possession. The court's order stated, in pertinent part, as follows:

7. The disputed parcel of land in this case falls completely within the legal description of the property owned by Jeanette Serowiecki.

8. The State cites case law in its brief suggesting that the various notes and descriptions accompanying various surveys and maps should be considered by this Court to justify a finding that the State acquired more land than was described in its deed of ownership given on May 28, 1945. However, the deed granting property to the State is not of the type that would require any interpretation of notes, descriptions, physical attributes of property, landmarks or historical usage patterns. The State was granted definitive portions of a section. By definition, those boundary lines would be north/south lines or east/west lines and would contain no angles but right angles to one another. There is no interpretation needed to ascertain exactly what was given or what was received in the transfer of land ownership due to the fact that quarter sections and half sections were the only descriptive terms used in the legal description granting ownership rights to the State. No reasonable person could infer anything other than the State's property ended at the straight Section line between Sections 1 and 2 which is along the same line as the section lines between sections running immediately north and south to Section[s] 1 and 2 in Township 30 N., Range 9 W. in Newton County, Indiana.

9. The only way that the State would be able to acquire the wedge shaped piece of property at issue in this case is th[r]ough a taking or through adverse possession.

10. The State has made it clear that they have not taken the property. Therefore there can be no inverse condemnation finding as well.

11. This leave[s] the State with the possibility of acquiring the property by adverse possession only.

12. There are several factors the Court must consider in determining whether an entity has acquired property by adverse possession. The Court need not delve into all of those issues because the issue of payment and discharge of property taxes is dispositive of this issue.

13. In *Fraley v. Minger*, 829 N.E.2d 476 [Ind.2005], our Supreme Court clarified a long legal history of adverse possession and the necessity for disposing of property taxes on the subject property. The Court reiterated that one wanting to possess property through adverse possession must pay and discharge all taxes and special assessments of every nature falling due on the subject property. The Court indicated that there may be situations where substantial compliance could satisfy the requirement, but refrain[ed] from allowing total disregard of the statutory tax payment requirement.

14. The undisputed facts in this case show that the State never paid or discharged any taxes on the property. While the State is not required to pay taxes on property they own, the subject property in this case was in fact taxed and those taxes were being paid on a regular basis. Jeanette Serowiecki and her predecessors were the ones paying all the taxes and assessments on the subject property.

15. Before the State could claim that they had satisfied the tax statute requirement for adverse possession, they would not only have to continue to not pay taxes as they would not normally do, but they would have to "discharge" the taxes so that no other entity would be required to pay them. The statute in place since 1927 specifically states that the taxes and special assessments must be "paid and discharged" by the claimant under an adverse possession theory. Resting on your belief that you do not have to pay taxes and allowing another person to pay taxes that have been assessed and billed for the same property does not meet the requirement to "discharge" the taxes and special assessments due on a piece of property.

*Id.* at 6–7.

"The trial court's grant of summary judgment is clothed with a presumption of validity and the appellant bears the burden of proving that the trial court erred." *Bamberger & Feibleman v. Indianapolis Power & Light Co.,* 665 N.E.2d 933, 936 (Ind.Ct.App.1996). Our review of a grant of summary judgment is governed by the following standard:

[W]e apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to a judgment as a matter of law. Once the moving party has sustained its initial burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment. Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court.

*City of Mishawaka v. Kvale,* 810 N.E.2d 1129, 1132–33 (Ind.Ct.App.2004) (citations omitted). The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which can be determined as a matter of law. *Bamberger & Feibleman v. Indianapolis Power & Light Co.,* 665 N.E.2d 933.

**1.**

The State first argues that it acquired title to the disputed tract by virtue of the physical characteristics of the land and the long-standing assumption that the ditch was the boundary line. The State maintains that the physical characteristics and historical usage prevail over the language of the deed. The Trustee responds that the parties' respective deeds "clearly and unambiguously describe the parcels to an extent that extrinsic evidence such as historical usage is prohibited." *Appellee's Brief* at 4.

"The object of deed construction is to ascertain the intent of the parties and where there is no ambiguity in the deed, the intention of the parties must be determined from the language of the deed alone." *Clark v. CSX Transp., Inc.,* 737 N.E.2d 752, 757 (Ind.Ct.App.2000), *trans. denied.* Generally, where no ambiguity is

present the trial court is constrained by the "four corners" rule. *Clark v. CSX Transp., Inc.*, 737 N.E.2d 752. That rule provides:

> "[I]n construing [a] written instrument[ ], the language of the instrument, if unambiguous, determines the intent of the instrument such that parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence. Even if ambiguity exists, extrinsic evidence is only admissible to explain the instrument and not contradict it."

*Id.* at 758 (*quoting Lippeatt v. Comet Coal & Clay Co., Inc.*, 419 N.E.2d 1332, 1335 (Ind.Ct.App.1981)).

The trial court found that because with its deed the State acquired "definitive portions of a section", resort to extrinsic evidence was not permitted. *Appellant's Appendix* at 6. The State does not dispute that there is no ambiguity in the deed by which the DNR took title, but nevertheless argues that resort to extrinsic evidence is permitted because of a mistake regarding the location of the property line between Sections One and Two due to the lack of an official survey and the location of the ditch and fence.

In the words of the State, "the earliest survey of the disputed property was sketchy at best." *Appellant's Brief* at 12. As explained in the 2007 surveyor's report, historically, the disputed area was covered by a lake. At some point the lake property was purchased, drained, and divided into forty-acre tracts. The earliest survey was presumably done prior to the draining of the lake because the south end of the boundary line between Sections One and Two was not clearly established and extended into the area that was once covered by water. Further adding to the confusion

as to the boundary line between Sections One and Two is that in the 1930s, a ditch was created that ran in a southeasterly direction from the northern boundary line where Sections One and Two meet to the southern boundary line of Section One. The State maintains that the ditch created the impression that the property line was angled along the ditch. Thus, when the State acquired its portion of Section 2 in 1945, the State assumed the ditch was the property line.

We begin by making several observations about the 1994 plat map to which Mrs. Sikora referred in her letter dated November 27, 1996. *See* Figure 1, *supra.* First we note that in addition to the solid, slanted line that Mrs. Sikora claims is not the property line, the plat map also shows a perpendicular dotted line between Sections One and Two. We further observe that a dotted line is used to depict the southern boundary line of Sections One and Two, as well as several other boundary lines between other sections depicted on the same plat map. From the copy of the map provided in the record, it is unclear why some of the Section lines are dotted and others are solid. Nevertheless, no one disputes that the dotted line represents the southern boundary line of Sections One and Two. It thus appears that the perpendicular dotted-line between Sections One and Two represents the boundary line between those Sections. We further observe that the 1994 plat map depicts the location of other ditches with a solid line. No one disputes that the solid, angled line is a line depicting the ditch. Finally we observe that every Section on the plat map is depicted as having perpendicular lines and thus, right angles at every corner. The solid angled line about which Mrs. Sikora complains and the State argues is the boundary line does not

match up with the boundary line separating two adjoining sections to the South.

We further note that every map in the record depicts the location of the ditch with an angled line as well as a straight north-south boundary line between Sections One and Two. Indeed, The State acknowledges that "a survey would have shown a perpendicular line separated the properties". *Appellant's Reply Brief* at 2.

Moreover, although the State assumed the ditch was the boundary line, there is no evidence that Mrs. Sikora or her predecessor in title shared the same assumption. We agree with the trial court that the respective deeds granted the State and Mrs. Sikora "definitive portions of a section." *Appellant's Appendix* at 6. On each of the maps attached to Mrs. Sikora's 1996 letter, the boundary lines were depicted as perpendicular. Mrs. Sikora objected within two years after the 1994 plat map indicated that the boundary line possibly encroached into Section One.

Considering the designated evidence set forth above, we agree with the trial court that:

> No reasonable person could infer anything other than the State's property ended at the straight Section line between Sections 1 and 2 which is along the same line as the section lines between sections running immediately north and south to Section[s] 1 and 2 in Township 30 N., Range 9 W. in Newton County, Indiana.

*Id.* The State's incorrect assumption that the ditch was the property line did not vest legal title to the disputed property in the State.

2.

In the alternative, the State argues that it obtained title to the disputed tract through adverse possession. In *Fraley v. Minger*, 829 N.E.2d at 486, our Supreme Court synthesized and rephrased the elements of adverse possession, stating that "the doctrine of adverse possession entitles a person without title to obtain ownership to a parcel of land upon clear and convincing proof of control, intent, notice, and duration...." In addition to rephrasing the common law elements of adverse possession, our Supreme Court "renew[ed]" the applicability of the adverse possession tax statute, now codified at Ind.Code Ann. § 32–21–7–1 (West, PREMISE through 2007 1st Regular Sess.). *Fraley v. Minger*, 829 N.E.2d at 480. That statute requires the claimant or adverse possessor to show, in addition to the elements of common law adverse possession, that he or she has paid and discharged all taxes and special assessments the adverse possessor reasonably believes in good faith to be due on the land during the period the adverse possessor claims to have possessed the land adversely.[4]

Here, the trial court rejected the State's adverse possession claim because the State had not satisfied the tax requirement under I.C. § 32–21–7–1. The State responds that pursuant to Indiana Code Ann. § 6–

---

4. Specifically, I.C. § 32–21–7–1 provides:
   In any suit to establish title to land or real estate, possession of the land or real estate is not adverse to the owner in a manner as to establish title or rights in and to the land or real estate unless the adverse possessor or claimant pays and discharges all taxes and special assessments that the adverse possessor or claimant reasonably believes in good faith to be due on the land or real estate during the period the adverse possessor or claimant claims to have possessed the land or real estate adversely. However, this section does not relieve any adverse possessor or claimant from proving all the elements of title by adverse possession required by law.

1.1–10–2 (West, PREMISE through 2007 1st Regular Sess.), the State is exempt from property taxation. The State nevertheless acknowledges our Supreme Court's statement in *Fraley v. Minger,* that Indiana courts are obligated "to follow and enforce the adverse possession tax statute as enacted by our legislature." 829 N.E.2d at 493. Thus, in this case we are presented with the issue of whether the legislature, in enacting the adverse possession tax statute, intended to foreclose the possibility of the State from acquiring property through adverse possession. As acknowledged by the State, this is a case of first impression.

■ In its brief, the State notes that in light of the holding in *Fraley v. Minger,* "it appears that governmental units that are exempt from taxation may never acquire property through adverse possession." *Appellant's Brief* at 14. We agree with the State in its assessment of law with regard to this consequence of the statute. Our Supreme Court made clear in *Fraley v. Minger* that the adverse possession tax statute may not be totally disregarded.[5] Insofar as the State is exempt from paying property taxes, enforcement of the adverse possession tax statute therefore precludes any governmental unit from acquiring land through adverse possession. There is no exception in the adverse possession tax statute for governmental units that are

exempt from paying taxes. If an exception is to be made, it is for our legislature to so provide.[6]

Here, in addition to not paying taxes on the land, albeit because the State is exempt from paying property taxes, the State failed to discharge the taxes in that it collected taxes from the Sikoras on the disputed 18.6 acre tract of land presumably since they purchased it in 1951. The State therefore did not, and for that matter could not, acquire title to the disputed land through adverse possession.

3.

■■ As a third argument in support of its claim that the State acquired title to the disputed land, the State asks this court to consider the doctrine of title by acquiescence, a theory the State admits it did not present to the trial court. Generally, a party may not raise an issue on appeal that was not presented to the trial court, even in summary judgment proceedings. *McGill v. Ling,* 801 N.E.2d 678 (Ind.Ct. App.2004), *trans. denied.*

In *Huntington v. Riggs,* 862 N.E.2d 1263 (Ind.Ct.App.2007), *trans. denied,* this court applied the doctrine of title by acquiescence in a case involving a boundary line dispute between property owners who had treated a county road as the boundary line between their properties although the road did not coincide with the actual boundary-

---

5. The *Fraley* majority noted that the case of *Echterling v. Kalvaitis,* 235 Ind. 141, 126 N.E.2d 573 (1955) permitted substantial compliance with the adverse possession tax statute "in boundary disputes where the adverse claimant has a reasonable and good faith belief that the claimant is paying the taxes during the period of adverse possession." 829 N.E.2d at 493. Justice Sullivan, concurring in result with separate opinion in which Justice Rucker concurred, would have overruled *Echterling* and held that the adverse possession tax statute should be strictly enforced according to its plain language.

6. We would observe that the application of adverse possession seems particularly inappropriate and perhaps inequitable when a governmental entity is involved, especially in light of takings jurisprudence and our system of property rights. For an overview of the history of adverse possession and its interplay with the takings doctrine, see Andrew Dick, *Making Sense Out of Nonsense: A Response to Adverse Possession by Governmental Entities,* 7 Nev. L.J. 348 (2007) (cited in footnote one of the State's brief).

line. *Huntington v. Riggs* was decided by this court on March 21, 2007, twenty-six days prior to the State filing its motion for summary judgment in this case. The State, however, did not argue application of the doctrine of acquiescence to the trial court. In its reply brief, the State points to sparse case law on the subject of title by acquiescence, *see Huntington v. Riggs,* 862 N.E.2d 1263, and the timing of the *Huntington v. Riggs* decision as excusing its failure to argue application of the doctrine because such "would not [have] be[en] a likely word search on Westlaw." *Reply Brief* at 7.

The State's failure to argue application of the doctrine of title acquiescence to the trial court is not excused by the fact that a search on Westlaw would not have revealed the *Huntington v. Riggs* decision. As recognized by the *Huntington* court, the doctrine of title by acquiescence was "especially popular during the turn of the century" but "disappeared out of case law altogether in the sixties and seventies." *Huntington v. Riggs,* 862 N.E.2d at 1267. Even so, it remains that the doctrine is not new to the legal world. The State could have argued its application notwithstanding unawareness of this court's recent analysis of the doctrine in *Huntington v. Riggs.* Moreover, we note that the State failed to present this argument to the trial court during the summary judgment hearing, which was held nearly three months after the *Huntington v. Riggs* decision. We therefore agree with the Trustee that the State waived the argument of title by acquiescence by failing to first present it to the trial court.

Having concluded that the State did not acquire legal title to the disputed property because of a mistake as to the boundary line or under the doctrine of adverse possession, we affirm the trial court's grant of summary judgment in favor of the Trustee.

Judgment affirmed.

KIRSCH, J., and BROWN, J., concur.