**CORPORATION FOR GENERAL TRADE, Appellant–Plaintiff,**

**v.**

**Jerry A. SEARS and Sanitary District of the City of Terre Haute and Nancy L. Brentlinger, Appellees–Defendants.**

**No. 84A01–0203–CV–86.**

Court of Appeals of Indiana.

Dec. 26, 2002.

Kelvin L. Roots, John Christopher Wall, Wilkinson Goeller Modesitt Wilkinson & Drummy, Terre Haute, IN, Attorneys for Appellant.

Robert L. Wright, Misty Y. McDonald, Wright Shagley & Lowery, Terre Haute, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

This case involves a dispute over the use of a gravel road (referred to as the "dam road"), which extends along a dam and

across Lots 2, 3, and 4 of Krumbhaar's Subdivision in Vigo County, Indiana. The dam road runs southeast from a gate on the north boundary of Lot 2 (Hulman Street), across Lot 2 and the northeast corner of Lot 3, and into Lot 4, where it turns left into a residence. Corporation for General Trade (CGT) appeals the trial court's judgment finding a prescriptive easement in favor of Jerry A. Sears and Nancy L. Brentlinger (collectively referred to as "Sears"). CGT presents the following restated issues for review:

1. Was there sufficient evidence to support the trial court's finding of a prescriptive easement in favor of Sears?

2. Did the trial court err in not setting aside the Grant of Flowage Easement obtained in 1998 by Sears from the Terre Haute Sanitary District?

We reverse.[1]

The facts most favorable to judgment reveal that Joseph R. Cloutier purchased Lot 4 in Krumbhaar's Subdivision on December 2, 1954. This lot does not front a public road, and at the time of the conveyance, ingress and egress between the house on Lot 4 and a public road to the north (Hulman Street) was by way of an easement over a portion of the east side of Lot 1. Later in 1954, Cloutier acquired the east half of Lot 1 by warranty deed. In addition to renting out the house on Lot 4, Cloutier also allowed his business associate, Tony Hulman, to use the house as a hideaway and for entertainment until Hulman's death in the fall of 1977. In return for use of the property, Hulman & Co. maintained the property for Cloutier until about 1989.

In 1975, the Sanitary District of the City of Terre Haute (the Sanitary District) initiated the Thompson Ditch project, which involved the creation of a retention area to provide drainage and flood control. In order to construct and maintain the dam, the Sanitary District acquired, by condemnation, "a permanent right-of-way and permanent easement for the purpose of constructing, widening, straightening, deepening, maintaining, inspecting, servicing, operating, repairing, and consolidating the banks of a drainage ditch commonly referred to as 'Thompson Ditch.'" *Appellant's Appendix* at 31. This easement affected Lots 1, 2, 3, and 4, in addition to several other tracts in the immediate area.

Sometime in 1977, the Sanitary District completed construction of the dam, which extended over Lots 2, 3, and 4. As a result of the project, significant portions of Lots 1, 2, and 4 were flooded. Most notably, Lot 4's previous means of ingress and egress, through Lot 1, was, and is now under water. As part of the project, the Sanitary District built a road along the dam and erected a locked gate at its entrance on Hulman Street to limit access to the road. The dam road became to sole means of ingress and egress to and from the house on Lot 4.

In 1989, CGT purchased Lot 2 and the west half of Lot 1. Soon thereafter, Cloutier conveyed Lot 4 and the east half of Lot 1 to CGT. This last transaction placed title to all of Lots 1, 2, and 4 in the name of Cloutier's company, CGT, the present owner. Cloutier died soon after these conveyances. In 1990, his son, Joseph A. Cloutier (Joseph), left employment with Hulman & Co. under less than amicable circumstances and ordered Hulman & Co. to stop performing maintenance and using the dam road.[2] Joseph also obtained

---

1. We heard oral argument in Indianapolis on November 22, 2002.

2. Hulman & Co. employees had also been using the dam road and a dirt lane that ex-

a survey that year and learned that the dam road crossed Lot 3. Thereafter, he approached a Morris Blumberg about purchasing Lot 3, with no success. In 1994, Joseph moved into the residence on Lot 4, where he and his family reside today.

The history of ownership and use of Lot 3 prior to 1997 is not well developed in the record. In particular, the record contains little to no evidence of who had legal title to Lot 3 between 1977 and 1997.[3] Several witnesses, however, made general references to the Blumberg family or Morris Blumberg owning property in this area, including Lot 3. In particular, Joseph testified that he believed Morris Blumberg owned Lot 3 prior to 1997. Debra Doonehoffer, who rented the property on Lot 4 in the late 1980s and early 1990s, explained that the Blumbergs were her neighbors and that when she met a Mr. Blumberg, he showed her the boundary lines of his property. Further, Fred Fields, a caretaker for Hulman & Co., testified that prior to 1990 he was "aware that Blumbergs had property back here" and that he offered Morris Blumberg a key to the gate. *Transcript* at 152. Fields did not state whether Morris accepted the key, and no other witness could testify that Morris had a key to the gate.

The primary evidence regarding ownership and use of Lot 3 prior to 1997 came from the testimony of Wayne Gorman. Gorman testified that he was born and raised on the Blumberg property, as his father was the Blumbergs' farm manager. Gorman left the farm in 1966 after getting married and returned around 1984 to become the farm's caretaker. While portions of the farm had been sold prior to his

return, Gorman testified that the Blumbergs still owned the property relevant to this action. Gorman explained that he worked for and closely with Morris Blumberg. In particular, he testified that he and Morris would drive on the dam road probably two or three times a year to check the property. Gorman explained that they checked this particular area because he had previously warned Morris that the overflow on the dam was causing erosion. Gorman entered the gate only when it was open, as he did not have a key. He noted that on one occasion he and Morris stopped to check the property and found the gate closed. When they returned the following day, the gate was open and they entered to check the property. Finally, Gorman testified that Morris moved to Florida in 1992 and Gorman remained as the caretaker of the property.

In 1997, Sears purchased what he referred to as the Blumberg property (Lots 3, 5, 6, 11, and 12) from sixteen to nineteen different people.[4] With regard to Lot 3, the evidence reveals that Sears obtained a quitclaim deed from Morris Blumberg and warranty deeds from Ellen Louise Rubert and Benjamin Mautner Blumberg. Since his purchase of the land, Sears regularly used the dam road to access Lots 3, 5, and 6 and to show prospective buyers the land. He subsequently sold Lots 5, 6, 11, and 12 to Brentlinger in 1999 or 2000. He informed Brentlinger that she could gain access to the property via the dam road and that this was the most convenient access.

When Joseph moved into the residence on Lot 4, he installed an electric gate at the entrance of the dam road at Hulman

---

tended off of the road and over a portion of Lot 5 to access Hulman property to the east.

**3.** This is also true to an even greater extent with respect to Lots 5, 6, 11, and 12.

**4.** He also purchased several other surrounding lots that are not at issue in this case.

Street. Sears gained entry through the gate by asking the city engineer's office for the code. He did not ask Joseph for the code because he did not believe Joseph would give it to him. After changing the access code several times, Joseph eventually discovered who was giving the code to Sears. He then met with the city attorney and the city engineer and was assured that the code would not be provided to Sears in the future. Sears eventually contacted Joseph and asked for permission to use the dam road. Joseph refused. Thereafter, on or about October 25, 2000, Sears erected a cable barrier across the portion of the dam road that crossed Lot 3, blocking access between Hulman Street and Joseph's residence.

On October 27, 2000, CGT filed a Complaint against Sears seeking an order enjoining Sears from interfering with CGT's access to the right-of-way across Lot 3, determining that CGT had acquired a prescriptive easement over that portion of Sears's property, and declaring the rights of the parties arising from a 1998 Grant of Flowage Easement. CGT and Sears then each filed motions for preliminary injunction. The trial court set the matter for hearing on November 3, 2000. Following the evidentiary hearing, the trial court granted both motions for preliminary injunction, ordering Sears to remove the cable barrier and CGT to provide the access code for the gate to Sears.[5]

On December 19, 2000, Sears filed a counterclaim, in which he sought to establish a prescriptive easement over the portions of the dam road crossing Lots 2 and 4 and enjoin CGT from blocking his access. On March 12, 2001, CGT was granted leave to amend its complaint and add Brentlinger as an additional defendant.

Thereafter, Brentlinger filed a counterclaim similar to that filed by Sears.

A bench trial was held in the matter on November 29, 2001 at which time the trial court incorporated the testimony and exhibits from the November 3, 2000 hearing. After additional evidence was presented, the trial court granted CGT's Motion for View of the Property and conducted a view of the dam road and surrounding properties. On February 20, 2002, the trial entered special findings, pursuant to a request from CGT. After setting forth its findings and conclusions, the trial court entered the following judgment:

It is therefore ORDERED, ADJUDGED and DECREED:

1. That [Sears] and [Brentlinger] have established a prescriptive right of ingress and egress over [Lots 2 and 4].

2. That [CGT] has established a prescriptive right of ingress and egress over [Lot 3].

3. That [Sears], [CGT], and [Brentlinger] are enjoined from restricting one another's passage on the dam road as it presently crosses [Lots 2, 3, and 4].

4. That [Sears], [CGT], and [Brentlinger], and their agents, servants, employees, assignees, guests, and representative are entitled to the enjoyment and use of the dam road as it crosses [Lots 2, 3, and 4].

5. That in the event the gate, presently located at the entrance to the "dam road" from Hulman Street, continues to be in place, it shall be the responsibility of the parties or their assigns to share the cost of maintenance and upkeep of said gate and,

---

5. Soon after the hearing on the motions for preliminary injunction, CGT timely sought a change of venue from the judge, and the Honorable Thomas E. Johnson qualified as Special Judge in the case.

further, to furnish to one another any combination or code that obstructs the passage through said gate.

6. That to the extent that the Sanitary District of the City of Terre Haute does not maintain the "dam road" as it crosses [Lots 2, 3, and 4] then, in that event, the cost of maintenance shall be shared equally by [Sears], [CGT], and [Brentlinger], or their assigns.

7. That the easements across [Lots 2 and 4] attached to and runs (sic) with [Lots 3 and 5].

8. That the easement across [Lot 3] attaches to and runs with [Lots 2 and 4].

9. That these easements are taken subject to the rights of the Sanitary District of the City of Terre Haute.

*Appellees' Appendix* at 18–19. CGT now appeals.[6]

### 1.

As noted, the trial court made findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. The purpose of such special findings is to provide the parties and the reviewing court with the theory upon which the case was decided. *Carnahan v. Moriah Prop. Owners Ass'n, Inc.*, 716 N.E.2d 437 (Ind.1999). We afford special findings a two-tier standard of review. First, we determine whether the evidence supports the findings. Second, we determine whether the findings support the judgment. *Id.* The findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. *Id.* "We will disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* at 443. "In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom." *Ballard v. Harman*, 737 N.E.2d 411, 416 (Ind.Ct.App. 2000).

Prescriptive easements are not favored in the law, and in Indiana, the party claiming one must meet stringent requirements. *Carnahan v. Moriah Prop. Owners Ass'n, Inc.*, 716 N.E.2d 437. "In order to establish the existence of a prescriptive easement, the evidence must show an actual, hostile, open, notorious, continuous, uninterrupted adverse use for twenty years under a claim of right."[7] *Id.* at 441. The party asserting the prescriptive title has the burden of showing each of these elements, which must each be established as a necessary, independent, ultimate fact, and the failure to establish any one of such elements is fatal. *Id.* Continuity of use for the required twenty-year period may be established by tacking from the use of predecessors in title. *Bauer v. Harris*, 617 N.E.2d 923.

Initially, we observe that prior to Sears's purchase in 1997, evidence regarding the chain of title to the property in question is clearly lacking. As noted previously, the only deeds in the record are two warranty deeds from Ellen Louise Rubert and Benjamin Mautner Blumberg to Sears and a quitclaim deed from Morris

---

6. Sears does not appeal the trial court's finding of a prescriptive easement in favor of CGT. Therefore, our decision does not affect that portion of the trial court's judgment.

7. While prescriptive easement may also be established by continuous adverse use with the knowledge and acquiescence of the servient owner, this is not at issue in the instant case. *See Bauer v. Harris*, 617 N.E.2d 923 (Ind.Ct.App.1993).

Blumberg to Sears. There is absolutely no evidence in the record as to who Ellen and Benjamin are, how many years they had an interest in the property, and to what extent, if at all, they used the dam road. With regard to the prior ownership of this property, Sears testified on cross-examination:

[Counsel]: Let's talk a little bit about the deeds that you have obtained from various people to acquire this property. Do I understand that at that time Morris Blumberg was dead?

[Sears]: No, he was alive.

[Counsel]: He was alive?

[Sears]: Uh huh.

[Counsel]: But this property was owned by like sixteen to nineteen people, is that what you said?

[Sears]: I believe there was that many of them. There was a trust, Ben Blumberg Trust on the back part and Morris Blumberg on the front part.

[Counsel]: Who owned Lot 3?

[Sears]: Uh, I really would have to research that, I don't know.

[Counsel]: It could have been owned by any one of these sixteen to nineteen people?

[Sears]: I believe it was owned by Morris Blumberg, I'm not sure of that, Morris Blumberg or his direct successors which are his daughters and sons, cause I believe the back eighty acres was owned by the Ben Blumberg Trust which included some grandchildren and other people.

[Counsel]: Well, you say his successors, I'm not quite sure I understand. He was alive when you took title to it?

[Sears]: Yes, he was.

[Counsel]: Okay. So title could have been in the name of some of his children, is that what you are saying?

[Sears]: That's what I am saying it could have been in his name or some of his children or . . .

*Transcript* at 101–03 (omission in original).[8]

▮ It is axiomatic that in order to establish continuity of use by tacking, one must establish a chain of title for the entire twenty-year period and establish each predecessor in title's use of the alleged right-of-way. Clearly this was not done in the instant case.

Even were we to assume that Morris Blumberg was the predecessor in interest to Lots 3 and 5,[9] we observe that evidence regarding his use of the dam road is sparse and non-existent prior to 1984. To satisfy the twenty-year period, Sears was required to show that Morris used the dam road in a hostile, open, notorious, continuous, uninterrupted and adverse manner between 1980 and 1997. Sears presented absolutely no evidence of any use of the dam road by Morris prior to Gorman's return to the farm in 1984.

Essential to the trial court's judgment is the following finding of fact:

46. From the time the dam was completed, up until the purchase of the Blumberg property by [Sears], [Gorman], as property manager for the Blumbergs, used the road to gain access to the Blumberg property.

---

**8.** Each citation to *Transcript* refers to the transcript from the November 29, 2001 trial.

**9.** We note that this is a considerable assumption given the fact that Morris executed only a quitclaim deed to the property, while two other individuals executed warranty deeds. Further, there is no evidence of record as to how long, if at all, Morris held title to each lot.

*Appellees' Appendix* at 14. This finding is clearly erroneous, because the evidence presented at trial reveals that Gorman left the farm in 1966 and did not return to become the property manager for the Blumbergs until 1984. Therefore, Gorman's testimony that he used the dam road two or three times a year, with and without Morris, to check on the property only encompasses the period following Gorman's return in 1984.

During oral argument, Sears argued that one might reasonably infer that Morris checked his property in the same manner and frequency in the four years prior to Gorman's return. In essence, Sears asks that we simply infer actual use (in addition to each of the other elements for establishing a prescriptive easement) for one-fifth of the required period that he had the burden of establishing. Such an inference does not comport with the stringent requirements mandated for establishing a prescriptive easement. *See Carnahan v. Moriah Property Owners Ass'n, Inc.,* 716 N.E.2d at 441 (noting that "[p]rescriptive easements are not favored in the law" and "the party claiming one must meet 'stringent requirements' "). We further note that the evidence does not support such an inference. Gorman testified that he and Morris used the dam road two or three times a year to check for erosion on the property. He explained that they did so because he had previously warned Morris that the dam was causing erosion. Thus,

the reasonable inference is that Morris started checking the property two or three times a year only after Gorman returned in 1984 and warned him of the erosion. Such evidence leaves Sears approximately four years short of the required twenty-year period for establishing a prescriptive easement.[10]

Because Sears failed to establish a twenty-year chain of record title and twenty years of actual use by him and his predecessors in title, we need not address the sufficiency of the evidence regarding the other elements of a prescriptive easement claim. The trial court erred in concluding that Sears and Brentlinger had established a prescriptive right of ingress and egress over Lots 2 and 4 and in enjoining CGT from restricting their passage on the dam road.

2.

We now address the validity of the Grant of Flowage Easement (the Flowage Easement) entered into between Sears and the Terre Haute Sanitary District in 1998, in which the Sanitary District granted to Sears, "the perpetual right, whether now owned or hereafter acquired, for ingress and egress over, on and across the existing dam across Thompson Ditch".[11] *Appellant's Appendix* at 54–55. The trial court failed to address this issue in its judgment, despite the fact that it was raised in CGT's complaint.

---

10. We reemphasize that Sears presented no evidence that Morris used the dam road in any way other than to check for erosion two or three times a year after 1984. There is no evidence that Morris used the dam road as a general means of ingress and egress to and from his property. Contrary to Sears's assertion on page 25 of his appellate brief, the dam road was not the only means of reaching "the Blumberg property". Finally, while Sears would like to place the burden of proof with CGT, we observe that Sears presented no evidence that Morris ever had a key to the

gate. To the contrary, Gorman testified that he was not aware of Morris having a key and that on one occasion they turned away from checking the property when they found the gate closed and locked. This would lead a reasonable factfinder to believe that Morris did not have a key.

11. The instrument further described as the appurtenant real estate all of the land Sears acquired in 1997.

Sears asserts that this is a non-issue because it was neither raised nor evidence thereon presented at trial.[12] We observe in this regard that evidence was presented at the preliminary injunction hearing regarding the Flowage Easement.[13] In particular, the Flowage Easement was offered into evidence. Further, at trial on November 29, 2001, CGT specifically requested the court to "declare the grant of flowage easement entered into between Jerry Sears and the Sanitary District on November 16, 1998, to be null and void and Ab initio from the beginning." *Transcript* at 7. The Sanitary District responded, "[a]s to the 1998 Flowage Easement, we have no objection to the court setting that aside at this point." *Transcript* at 8.

■ This issue can be quickly disposed of as a matter of law. The undisputed evidence reveals that, in 1975, the Sanitary District obtained limited rights (an easement rather than a fee simple interest) by condemnation from the owners of Lots 2 and 4 in order to construct and maintain the dam. As evidenced by the Certificate of Appropriation and Payment, executed on July 16, 1975, the Sanitary District merely acquired "a permanent right-of-way and permanent easement *for the purpose of* constructing, widening, straightening, deepening, maintaining, inspecting, servicing, operating, repairing, and consolidating the banks of a drainage ditch commonly referred to as 'Thompson Ditch.'" *Appellant's Appendix* at 31 (emphasis supplied). The Sanitary District could not legally extend its rights to non-governmental third parties who had nothing to do with constructing or maintaining the dam but simply sought to use the right-of-way for access to adjacent land. The Flowage Easement had the effect of expanding the

dominant estate and improperly subjecting the servient estate (Lots 2 and 4) to extra burdens. *See Brock v. B & M Moster Farms, Inc.*, 481 N.E.2d 1106, 1109 (Ind. Ct.App.1985) ("[a]n easement cannot be changed to subject the servient estate to a greater burden than was originally agreed upon without the consent of the owner of the servient estate"); *Brown v. Heidersbach*, 172 Ind.App. 434, 438, 360 N.E.2d 614, 618 (1977) ("titleholder of the dominant estate cannot subject the servient estate to extra burdens any more than the holder of the servient estate can materially impair or unreasonably interfere with the use of the easement") (citation omitted).

As a matter of law, we conclude that the Sanitary District had no legal right to grant an easement over CGT's property to Sears. Therefore, the Flowage Easement is null and void.

Judgment reversed.

SHARPNACK, J., and NAJAM, J., concur.

---

12. Sears concedes that he does not rely on the Flowage Easement to establish his rights of continued use of the dam road.

13. As noted previously, the trial court incorporated the testimony and exhibits from the preliminary injunction hearing into the record at trial.