**Patrick ROBERTS and Christine Roberts, Appellants–Plaintiffs,**

v.

**Robert A. FEITZ and Bob E. Feitz, Appellees–Defendants.**

No. 71A04–0910–CV–581.

Court of Appeals of Indiana.

Aug. 6, 2010.

Lee Korzan, South Bend, IN, Attorney for Appellants.

James A. Masters, Nemeth, Feeney, Masters & Campiti, P.C., South Bend, IN, Attorney for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Plaintiffs, Patrick and Christine Roberts (collectively, the Roberts), appeal the trial court's Judgment in favor of

Appellees–Defendants', Robert and Bob Feitz (collectively, the Feitzes), counterclaim, determining that the Feitzes are legal owners of the disputed access lane (Disputed Lane).

We affirm.

## ISSUES

Roberts raise four issues on appeal, which we restate as the following:

(1) Whether the trial court erred when it determined that the Feitzes chain of title was superior to the Roberts;

(2) Whether the trial court erred when it determined that the Roberts and their predecessors in title had not acquired title to the Disputed Lane by adverse possession;

(3) Whether the trial court erred when it determined that the Roberts and their predecessors had not acquired title to the Disputed Lane by prescriptive easement; and

(4) Whether the trial court erred when it determined that the Roberts' predecessors had acquiesced to the Feitzes south property line.

## FACTS AND PROCEDURAL HISTORY

This case arises from a boundary line dispute between two adjoining parcels of real estate located in Lakeville, St. Joseph County, Indiana. Within the disputed area is the Disputed Lane which provides access from Linden Road to Fites Lake that both the Roberts and the Feitzes lay claim to. In 1995, Robert Feitz and his son, Bob, acquired approximately twenty-two acres of real estate pursuant to a warranty deed from Glen and Helen Stoops (Stoops). The real estate is bounded by Linden Road on the west and Fites Lake on the east. According to the legal description of their deed, the south boundary line of their real estate is twenty feet south of where the Heston ditch crosses

Linden Road. The Feitzes property is north of and adjacent to the Roberts' property. The Roberts acquired their land in 2002 from Silvester and Dorothy Sowinski (Sowinskis). According to the quitclaim deed by which they acquired their real estate, the north boundary property line is seventy-five feet north of the ditch, which is the basis for this boundary dispute. Compounding the problem of locating the proper boundary is the fact that the monument for the relevant west quarter corner cannot be located and is considered as obliterated or lost. Additionally, subsequent surveys have reached conflicting opinions on the location of the west quarter corner.

A better understanding of the dispute requires a look at the original parcel of land which was divided into three parcels of land: (1) the Feitzes parcel; (2) the Roberts parcel; and (3) a 1.5 acre parcel currently owned by Vicky Kruszka (Kruszka). All three parcels were once part of a larger parcel owned by Schuyler and Emma Robertson (Robertsons). The Robertsons initially conveyed the three parcels to the original predecessors in 1915, 1920, and 1937, respectively, as will be discussed below.

### Kruszka's Chain of Title

In 1915, the Robertsons conveyed land to James and Helen Hershey (Hersheys). The deed contains the following legal description of what was conveyed:

Beginning at a point which marks the South West corner of the boundary line of lands owned on the South by F.M. Smith and on the North by said grantors and coming to the North and South Sec. Line of Twp. 35 N. Range 2 East, thence north *20 feet to an open ditch [and] following the west bank of said Ditch Northeast 387 feet*, thence North 400 feet thence North West 529 feet,

thence South along said road [i.e., Linden Road] 54 rods to the point of beginning, the description herein is intended to convey all the land lying between said ditch and said road as herein described and containing one and one-half acres more or less.

(Appellants' Exhibit 17) (emphasis added). Maud McCullough's affidavit in aid of title of real estate dated July 28, 1958, states that the Heston ditch is twenty feet north of the northwest corner of the land conveyed by the Robertsons to Valentine Beyler (Beyler), which would eventually become the Roberts property. The reference to the Heston ditch being twenty feet north of the north boundary line is found in subsequent warranty deeds in Kruszka's chain of title. Additionally, the affidavit and reference to the location of the Heston ditch was included in the conveyance to Kruszka on March 11, 1993.

### Roberts' Chain of Title

The original deed in the Roberts chain of title is the 1920 deed from the Robertsons to Beyler. The deed contains the following legal description:

Beginning at the South West corner of the North west quarter (1/4) of section No. two (2) Township No. thirty-five (35) North, Range No. Two (2) east, thence North on the center line of a road running along the west line of said section sixteen (16) rods; *thence east to the west line of a tract of land heretofore conveyed by the Grantors to Schuyler C. Shidler*, thence South to the South line

of the North west quarter (1/4) of said section; thence west to the place of beginning, *containing 3 acres more or less.*
(Appellants' Exh. 24) (emphasis added). According to the Recorder's abstract of the deed, the clause "containing 3 acres more or less" was added to the deed two days after the deed was executed in 1920. The actual acreage conveyed was approximately 5.2 acres, not 3 acres as described in the deed.[1] Beyler lost the parcel of land to a tax sale, which was then purchased by Walter and Lulu Geyer (Walter and Lulu) in 1958. Subsequent deeds in the chain of title, with the exception of the Beyler tax deed to the county and the Commissioners' deed to Walter and Lulu, both of which contain abbreviated legal descriptions, do not summarize the parcel as containing "3 acres more or less."[2] (Appellants' App. p. 11). The warranty deed from Walter to Lulu, who conveyed the parcel to Loren and Phyllis Geyer (Loren and Phyllis) in 1966, used the original language and description from the Robertson to Beyler conveyance, and included the phrase "264 feet wide and 865 feet long." (Appellants' Exh. 28). This language was also used when Loren and Phyllis conveyed the property by warranty deed to John and Juanita Papczynicski (Papczynicski) that same year.

In 2002, the Sowinskis acquired the property by a quitclaim deed from the children of John Papczynicski, who had acquired equal shares of the property after their father's death. As part of a contemporaneous transaction, the Sowinskis deed-

---

1. The call in the legal description in the Robertson to Beyler deed "thence east to the west line of a tract of land heretofore conveyed by the Grantors to Schuyler C. Shidler" describes an east-west dimension for the land conveyed of approximately 865 feet. Additionally, sixteen rods is 264 feet; therefore, the actual dimensions of the parcel are 264 feet by 865 feet, or 5.2 acres (264 ft. c 865 ft. = 228,360 ft./43560 ft. = 5.24 acres).

2. The legal description used in that tax deed is "SW PT NW 3 AC." (Appellants' App. p. 12). The legal description in the deed from the County Commissioner to Walter and Lulu describe the property as "SW pt. NW Sec. 2 Twp. 35 R2E." (Appellants' App. p. 12).

ed the parcel to the Roberts. The land transferred by this deed is described substantially the same as the land described in Loren and Phyllis' deed to the Papczynicskis, except that neither the Sowinskis or Roberts deed contained the phrase "approximately 264 feet wide and 865 feet long." (Appellants' Exh. 31). However, the deed does describe the property as running "East to the West line of a tract of land heretofore conveyed to Schuyler C. Robertson and Emma A. Robertson to Schuyler C. Shidler[.]" (Appellants' Exh. 31).

### Feitzes' Chain of Title

The chain of title to the Feitzes' real estate begins with a warranty deed from the Robertsons to their daughter Blanche Moore (Moore) in 1937. By this deed, the Robertsons conveyed a large tract of land after excepting out parcels of land which they had previously conveyed to other grantees, including the lands conveyed to the Hersheys in 1915 and to Beyler in 1920. In 1946, Moore executed a warranty deed to Charles and Odessa Banghart (Bangharts). The legal description in this deed was prepared by Bert McClellan (McClellan Diagram) and created a new legal description for the parcel that was being conveyed to the Bangharts. It describes the south boundary line of the land to be 264 feet north of and parallel to the east-west center line of Section 2, Township 35 North, Range 2E. Additionally, it describes the south boundary line of the land to be 20 feet south of the "open ditch." (Appellants' Exh. 43). On December 23, 1970, an affidavit in aid of title to real estate by James Culp was recorded and established that the Bangharts had, for more than twenty years, "actual, peaceable, visible, exclusive, open, notorious, hostile, continuous, uninterrupted, adverse possession of the whole" of the real estate described in their deed. (Appellants' Exh. 37). The legal description in the Bang-

harts' deed remained in effect up until the real estate was deeded to the Stoops in 1976.

In 1993, the Stoops wanted to isolate their house away from the remaining portion of the property and sell the remaining portion to the Feitzes. As a result, the Stoops had the property surveyed by Lang–Feeney & Associates. The survey changed the legal description of the Stoops' property as it had been used in prior deeds. The new legal description does not refer to the south boundary line of the land as being 264 north of the east-west center line of Section 2, Township 35 North, Range 2E; instead, the survey prepared by Lang–Feeney & Associates locates the south line of the real estate 20 feet south of the ditch where it crosses Linden Road. This new legal description was contained in the deed conveyed to the Feitzes in 1995. The Lang–Feeney & Associates survey was called into question by Bob Palm (Palm), who was hired by the Papczynicskis to survey their property in 1996.

### The Dispute

The dispute arose sometime between 2004 and 2005, when Bob Feitz noticed a "for sale sign" that the Roberts had placed in front of the Disputed Lane. Bob called the realtor, who in turn contacted the Roberts and informed them that Bob claimed to have title to the Disputed Lane. On August 10, 2006, the Roberts filed a Complaint against the Feitzes to quiet title, seek declaratory judgment and ejectment. On September 27, 2006, the Feitzes answered the complaint, and subsequently filed a counterclaim to quiet title and for trespass. After a failed attempt at mediation, the cause was set for a bench trial on August 4–5, 2008, and October 14, 15, and 17, 2008. Prior to the admission of evidence, pursuant to Indiana Trial Rule

52(A), the Feitzes requested specific findings of fact and conclusions of law. Each party submitted their respective proposed findings and conclusions to the trial court. On September 9, 2009, the trial court entered eighty findings of fact and thirty-nine conclusions of law and judgment in favor of the Feitzes.[3] The trial court made the following findings and conclusions, in relevant part:

39. The legal description used in the Moore and Lung to Banghart Warranty Deed describes the south boundary line of the land conveyed to be 20 feet south of the 'open ditch.'

\* \* \*

50. According to the testimony of County Surveyor John McNamara, the ditch has not moved from the location described in the Robertson to Hershey deed.

51. The various deeds and other documents in evidence indicate that there was confusion or lack of knowledge as to the location of the west quarter corner and the east-west center line of the quarter section.

52. The first deed off by Robertson, the deed to Hershey, refers to 'a point which marks the south west corner of the boundary line lands owned on the south by F.M. Smith.' [ ] Smith's land was south of and adjacent to Robertson's land. The north boundary of Smith's land was the quarter section line. [ ] The 'point which marks the

south west corner of the boundary line' would be the west quarter corner of the section.

53. However, before Bob Palm marked the point that he determined to be the west quarter corner of the section by his 1996 survey for Joseph Papczynicski [ ], there was no evidence of the location of the west quarter corner, either by a marker or monument at the location in the field or a record in the County Surveyor's Office.

54. In 1966, William Fuller apparently used the legal description of the various parcels involved in this dispute to prepare a plat diagram of the area in which these parcels are located. [ ] This plat diagram was described throughout the proceeding as the Fuller "survey".…

55. [The] Fuller[ ][D]iagram shows the east-west center line of the quarter section based on the discretions in the various deeds. No marker was set at this point.

\* \* \*

57. The Fuller Diagram identifies a line which divides the land formerly owned by Schuyler Robertson and F.M. Smith. That line is 95.8 feet north of the location of the east-west center line of the quarter section shown on the Fuller Diagram based on the descriptions in the various deeds. The Fuller Diagram notes that an iron pipe was found at the line which divides the land formerly owned by Robertson and

---

3. We note that the trial court's findings of fact and conclusions of law are nearly identical to the proposed findings and conclusions submitted by the Feitzes. In *Wrinkles v. State*, 749 N.E.2d 1179, 1188 (Ind.2001), our supreme court has stated that while this practice is not prohibited, it is strongly discouraged:

We recognize that the need to keep the docket moving is properly a high priority of our trial bench. For this reason, we do not

prohibit the practice of adopting a party's proposed findings. But when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court. This is particularly true when the issues in the case turn less on the credibility of the witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony.

Smith. The Fuller Diagram also shows a fence at that location.

58. According to the Fuller Diagram, the north boundary line of the Roberts real estate is 168.2 feet north of the line which divides the land formerly owned by Robertson and Smith.

59. According to the Fuller Diagram, the south boundary line of the Feitz[es'] real estate is 20 feet south of the ditch.

60. The various measurements shown on the Fuller Diagram are reflected in the Ogle to Mahoney deed. [ ]. In that deed, the courses describing the land bounded by the ditch differ from the description of the land bounded by the ditch in the Robertson to Hershey deed. The courses around the ditch used in that deed are the courses shown on the Fuller Diagram.

61. According to the 2005 Lang–Feeney & Associates survey, the south boundary of the Feitz[es'] real estate is 20 feet south of the ditch. Lang–Feeney [& Associates] also located the west quarter corner of the section on that survey at 2,640 feet north of the south west corner of Section 2. The Lang–Feeney [& Associates] survey shows a distance north and south between the east-west center line, which is the south line of the Roberts real estate, and the south boundary of the Feitz[es] real estate of 186.03 feet. According to the Lang–Feeney [& Associates] 2005 survey, the Roberts real estate consists of 3.9 acres measured from the south boundary line of the Roberts real estate 20 feet south of the ditch. [ ]

62. According to the Palm[ ] surveys, the west quarter corner of Section 2 is 24 feet north of the point where Lang–Feeney [& Associates] located the west quarter corner. [ ]. Measuring 264 feet (16 rods) north of the west quarter corner according to the Palm surveys cre-ates a 95 foot overlap of the Roberts north property line over the Feitz[es] south property line. The distance from the west quarter corner according to the Palm surveys to a line 20 feet south of the ditch is approximately 169 feet (264 ft.–95 ft.). Using this as the north-south dimension of the Roberts real estate and the 865 foot east-west call in the Geyer Warranty Deeds, the Roberts real estate consists of approximately 3.3 acres. (169 ft. × 865 ft. = 146,185/43,560 =3.35 acres).

63. The various real property tax statements to John Papczynicski introduced into evidence [ ] show that property taxes were assessed and paid on three (3) acres.

\* \* \*

65. The receipts for property taxes paid by [the] Roberts introduced into evidence [ ] show that the Roberts paid property taxes on three (3) acres.

66. Bob Palm testified that he found evidence of an old fence in the approximate location of where he determined the east-west center line of the quarter section to be located.

67. Terry Lang testified that he found evidence of an old fence in the approximate location of where he determined the east-west center line of the quarter section to be located, to the east of the location where Bob Palm found the fence.

68. This old fence was in the approximate location of the boundary line between the F.M. Smith land and the Robertson land.

69. Bob Feitz found evidence of an old fence on the south line of his property, 20 feet south of the ditch.

70. Terry Lang found evidence of an old fence at the location he established to be the south line of the Feitz[es] real

estate, approximately 20 feet south of the ditch. The fence is shown on the Lang–Feeney [& Associates] survey [ ] at the south boundary of the Feitz[es] real estate.

71. [Bob] Feitz replaced the fence at the south boundary line after he acquired the real estate. John Papczynicski owned the land to the south of the Feitz[es] real estate at the time and did not object to Feitz replacing the fence at the south boundary of the Feitz[es] real estate.

72. When [the] Feitz[es] acquired the real estate [ ] Bob Feitz did not observe [ ] signs of use or occupancy of the land 20 feet south of the ditch. Feitz did not see a picnic table, fire pit, or pier placed on the Feitz[es] land by anyone else.

73. When [the] Feitz[es] acquired their real estate [ ] there was a gate across the lane at Linden Road. Bob Feitz removed the gate and installed a gate approximately two vehicle lengths further to the east so that a vehicle towing a boat would have room to turn completely off Linden Road onto the lane and stop in front of the gate to open it.

\* \* \*

75. [The] Roberts, or other persons using their property, use the lane off Linden Road to access their property.

76. [The] Roberts, or other persons using their property, at times placed a picnic table, fire pit, pier and pitched a tent on the Feitz[es] real estate in the area 20 feet south of the ditch. Persons using the Roberts land park vehicles on the Feitz[es] real estate.

77. [The] Roberts, or other persons using their property, did not have permission from [the] Feitz[es] to use the Feitz[es] real estate for access to the Roberts real estate.

78. [The] Roberts do not have access off Linden Road onto their real estate because there is a wetlands area on their land adjacent to Linden Road.

79. [The] Roberts have not sought permission [from] the Indiana Department of Environmental Management and the Army Corps of Engineers to fill-in any portion of the wetlands on their real estate to create access on their property from Linden Road.

80. [The] Feitz[es] [have] obtained permission from the Indiana Department of Environmental Management and the Army Corps of Engineers to fill-in a portion of the wetlands on the Feitz real estate.

## LEGAL ANALYSIS AND CONCLUSIONS

\* \* \*

8. [ ][I]t is not necessary for the [c]ourt to choose between the surveys for the location of the west quarter corner in order to resolve this dispute between the parties. Moreover, it is not necessary for the [c]ourt to decide that there is an error in the deed from Robertson to Beyler in order to resolve this dispute.

9. In order to prevail in this action, [the] Roberts must prove that they have either an unbroken chain of title to their real estate for 50 years that is not divested by a superior chain of title (*see* Ind.Code § 32–20–3–1), or that they have acquired the disputed land by adverse possession. Roberts have failed to prove either an unbroken chain of title for 50 years or title to the disputed land by adverse possession.

\* \* \*

26. The land between the east-west center line, based on where the Lang–Feeney [& Associates] surveys set the

line, and the south line of the Feitz[es] real estate 20 feet south of the ditch is approximately 3.9 acres.

27. For [the] Roberts to lay claim to the land 20 feet south of the ditch, they would have to have adverse possession of and pay the real estate taxes on the approximate 5.2 acres described in the legal description used in the Robertson to Beyler or Geyer to Geyer warranty deeds.

28. According to the tax statements and receipts for payment in evidence, the Roberts have paid taxes only on 3 acres.

29. In order to establish title to the disputed land, [the] Roberts [were] required to prove that they had reasonable and good faith belief that they were paying taxes [on] land 20 feet south of the ditch for 10 years.

30. The Roberts cannot be seen to reasonably believe that they paid the taxes due on 5.2 acres of land when their tax statements and receipts for payment show that they paid taxes on only 3 acres of land. [ ]

\* \* \*

32. In order to claim a prescriptive easement over [the] Feitz[es'] land, [the] Roberts must prove use and control of the land for 20 years. [ ] The evidence presented does not prove use and control of the disputed land by [the] Roberts or their predecessors in interest for 20 years and that [the] Roberts and their predecessors in interest intended this use to be exclusive as against [the] Feitz[es] for the required time. [ ] The evidence at trial proves that [the] Feitz[es] exercised use and control over the property to the exclusion of Papczynicski by re-installing the fence that was 20 feet south of the ditch and mov-

ing and installing a gate on the access lane after [the] Feitz[es] acquired the land in 1992.[4] [Bob] Feitz maintained the fence and gate even after [the] Roberts started to use the disputed lane.

33. [The] Roberts have not sought permission [from] the Indiana Department of Environmental Management and the Army Corps of Engineers to fill-in any portion of the wetlands on their real estate to create access onto their property from Linden Road.

34. As such, the evidence presented by [the] Roberts at trial fails to demonstrate a prescriptive easement by necessity over the Feitz[es] real estate for ingress and egress to the Roberts property at the present time.

(Appellants' App. pp. 18–21; 25; 31).

The Roberts now appeals. Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

#### I. *Standard of Review*

 The trial court entered findings of fact and conclusions of law. Therefore, our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings and second, we determine whether the findings support the judgment. *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind.Ct.App.2009), *trans. denied.* Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Id.* In determining whether the findings on the judgment are clearly erroneous, we consider only the evidence favorable to the

---

4. The Feitzes actually acquired the land in 1995. (Appellees' App. p. 43).

judgment and all reasonable inferences to be drawn therefrom. *Id.*

In conducting our review, we cannot reweigh the evidence or judge the credibility of any witnesses, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id.* However, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id.*

## II. *Superior Chain of Title*

The Roberts first argue that the trial court erred when it determined that the Feitzes are the legal owners of the area in dispute and also the Disputed Lane, which is located within that disputed area. Specifically, they argue that their chain of title is superior to the Feitzes.

In its conclusions of law, the trial court stated the following, in relevant part:

8. [ ][I]t is not necessary for the [c]ourt to choose between the surveys for the location of the west quarter corner in order to resolve this dispute between the parties. Moreover, it is not necessary for the [c]ourt to decide that there is an error in the deed from Robertson to Beyler in order to resolve this dispute.

9. In order to prevail in this action, [the] Roberts must prove that they have either an unbroken chain of title to their real estate for 50 years that is not divested by a superior chain of title (*see* Ind.Code § 32–20–3–1), or that they have acquired the disputed land by adverse possession. [The] Roberts have failed to prove either an unbroken chain

of title for 50 years or title to the disputed land by adverse possession.

(Appellants' App. p. 25).

We agree with the trial court's approach that it is unnecessary for this court to determine which survey is accurate in analyzing this case, and instead, will determine which party has superior title. Indiana Code section 32–20–3–1 states:

A person who has an unbroken chain of title of record to an interest in land for at least fifty (50) years has a marketable record title to that interest, subject to section 2 of this chapter. A person is considered to have this unbroken chain of title when:

(1) the official public records disclose a title transaction of record that occurred at least fifty (50) years before the time the marketability is determined; and

(2) the title transaction purports to create an interest in:

(A) the person claiming the interest; or

(B) a person from whom, by one (1) or more title transactions of record, the purported interest has become vested in the person claiming the interest;

with nothing appearing of record purporting to divest the claimant of the purported interest.

We begin our analysis with determining whether the trial court erred in concluding that 1957 tax deed to the county severed the Roberts' chain of title because the deed lacks a specific description of the land. In *Sullenger v. Baecher*, 55 Ind.App. 365, 101 N.E. 517, 518 (1913), the trial court quieted Baecher's title against Sullenger for a tract of land that he purchased from a tax sale which conveyed 100 acres of a 200 acre parcel of land. Sullenger appealed, arguing that Baecher's tax

deed was insufficient to convey title, because "the description contained in the records made for taxation purposes [was] so uncertain, indefinite, and imperfect that no valid deed could be based thereon." *Id.* The description in the tax sale was as follows: "Henry L. Wheatley Part Lot 17. Township 1, Range 10, 100 acres." *Id.* The description in the notice of tax sale was similarly described. *Id.* In the delinquent list returned by the auditor, the land was described as: "Pt. lot 17, Township 1, Range 10, acres 100. Johnson Township, Knox County, Indiana." *Id.* In the tax sale record, the land was described as: "All survey 17 Township 1, Range 10, 100 acres, Johnson Township." *Id.* Finally, the tax certificate upon which the deed purports to be issued read: "Part of Sur. 17, Town one Range Ten containing 100 acres in Johnson Township, Knox County, Indiana." *Id.* We held that:

> [i]t is apparent we think that none of these descriptions were sufficient to indicate what part of survey 17 was covered by the description. No surveyor from this description alone would be able to locate and identify the particular tract intended, for the reason that 100 acres of the land laid off any place within the survey would meet and comply with all the terms of the description.

*Id.* As a result, our supreme court held that the lack of specificity in the various descriptions rendered the deed wholly ineffective to convey title. *Id. See also Armstrong v. Hufty,* 156 Ind. 606, 55 N.E. 443, 450 (1899) (holding that a description in a tax deed which stated "A part of the west ½ of the southeast ½ of section 21, township 25 north, 3 west containing 4 acres" was so defective as to convey no title); *Sharpe v. Dillman,* 77 Ind. 280, 284, 1881 WL 6660 (1881) (finding that a person cannot maintain an action for quieting a tax title if the description is so indefinite that the land cannot be identified).

Here, the Roberts trace their chain of title back to the initial conveyance: the Robertson's deed to Beyler. The dimension of the land described in the original deed is 264 feet by 865 feet, which describes a parcel of land approximately 5.2 acres. The deed contains a clause, inserted after it was signed and before it was recorded, that states that the land conveyed consists of "3 acres more or less." (Appellants' Exh. 24). At some point, the Beyler's lost the real estate to a tax sale, and the next title document in the chain of title is a tax deed to the county, dated June 25, 1957. The legal description used in that deed describes the property as "SW PT NW 3 AC." (Appellants' App. p. 12). However, when the county commissioners sold the Beyler property to Walter and Lulu in 1958, the legal description in that deed describes the property as "SW pt. NW Sec. 2. Twp. 35 R2E." (Appellants' Exh. 27, p. 2). The dimensions of the land are not indicated, and as such, the description does not describe anything more than the fact that the property is located in the northwest quarter of section 2, which includes in total 160 acres. We agree with the trial court that, on its face, it is impossible to tell what is being transferred. While this description is more detailed than the deed to the county, Louis Klatch, the title attorney with the Metropolitan Title Company, testified that the description is too vague and indefinite, and, as a result, title would not appear to be marketable. Additionally, Loren Geyer testified that based on the legal description in the tax deed to the county, he did not know how much land the county had acquired and in turn, conveyed to his father.

Thus, because of this imprecise description, the trial court concluded that the warranty deed from Walter and Lulu Geyer to Loren and Phyllis Geyer in 1966

appears to be the start of a new chain of title that could establish ownership of the 5.2 acres described in that deed to successors if there was nothing else to divest title under that deed for 50 years. However, the trial court found that the first deed in the Feitzes' chain of title—the 1946 warranty deed from Moore to the Bangharts—specifically describes the south boundary line of the land conveyed as being 20 feet south of the ditch and 264 feet north of the east-west center line of the quarter section. While the trial court noted that these two calls are inconsistent, as the boundary line could not be both 20 feet south of the ditch and 264 feet north of the east-west center line, the trial court went on to conclude that the south boundary line 20 feet south of the ditch, according to surveyor Terrance Lang, is more accurate and should be used, as it is also confirmed by the title evidence in the Kruszka chain of title, which locates the ditch at 20 feet north of the northwest corner of the land conveyed to Robertson to Beyler. In addition to the reference of the ditch in Kruszka's chain of title, the McCullough Affidavit also states that the Heston ditch is twenty feet north of the northwest corner of the land which would eventually become the Roberts property.

Next in the Feitzes chain of title is the Culp Affidavit, recorded in 1970, which establishes that the Bangharts had obtained adverse possession of the real estate described in the deed. Following this is the warranty deed from the Bangharts to the Reums, then from the Reums to the Stoops, and then the warranty deed from the Stoops to the Feitzes. This deed uses the legal description based on the survey prepared by Lang–Feeney & Associates for the Stoops that locates the south line of what is now the Feitzes real estate as being 20 feet south of the ditch that crosses Linden Road, which constitutes a chain of title that has existed for over 50 years,

all establishing that the south boundary line as 20 feet south of the ditch.

In sum, in addition to the Feitzes' chain of title, the Kruszka title and the McCullough Affidavit all confirm the location of the Feitzes' boundary line and that the legal description in the Moore to Banghart describes the property to be 20 feet south of the ditch, and by 1996, the Feitzes' title became superior to the Roberts chain of title.

### III. *Adverse Possession*

The Roberts also argue that the trial court erred when it determined that Papczynicski had not acquired title to the Disputed Lane by adverse possession. Specifically, the Roberts contend that "[e]ven if the tax sale somehow operated to divest Papczynicski/Roberts of legal title, John Papczynicski would have obtained good title to the entire parcel by 1968, or 1976 at the latest." (Appellants' Br. p. 38).

The traditional common law elements of adverse possession required the claimant to prove the possession was (1) actual; (2) visible; (3) open and notorious; (4) exclusive; (5) under claim of ownership; (6) hostile; and (7) continuous for a statutory period of time. *Fraley v. Minger*, 829 N.E.2d 476, 485 (Ind.2005). In *Fraley*, our supreme court rephrased the elements of adverse possession, providing that "the doctrine of adverse possession entitles a person without title to obtain ownership to a parcel of land upon clear and convincing proof of control, intent, notice, and duration." *Id.* at 486. Those elements are defined as follows:

(1) Control—The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the former elements of "actual," and in some ways "exclusive," possession);

(2) Intent—The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse");

(3) Notice—The claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open," "notorious," and in some ways the "hostile," elements); and

(4) Duration—The claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

*Id.* These elements must be satisfied for a period of ten years. *Hoose v. Doody,* 886 N.E.2d 83, 92 (Ind.Ct.App.2008) (citing I.C. § 34–11–2–11). In addition to satisfying the elements stated above, to establish title, Indiana Code section 32–21–7–1 requires the claimant or adverse possessor to pay and discharge "all taxes and special assessments that the adverse possessor or claimant reasonably believes in good faith to be due on the land or real estate during the period of adverse possessor or claimant claims to have possesses the land or real estate adversely." Because the Roberts' claimed control of the property is less than the ten year period requirement, they must tack their use of the Disputed Lane on to the prior owners. *Lake County Trust Co. v. Jones,* 821 N.E.2d 1, 4 (Ind. Ct.App.2004).

▮ The trial court found that the Roberts failed to prove ownership of the disputed land by adverse possession because they only paid taxes on three acres of land. In its findings of fact, the trial court stated the following:

63. The various real property tax statements to John Papczynicski introduced into evidence [ ] show that property taxes were assessed and paid on three (3) acres.

64. The tax history records in the County Treasurer's Office introduced into evidence from 1989 when John Papczynicski owned the real estate through [the] time the Roberts acquired the real estate up to 2008 show property taxes to be assessed on three (3) acres.

65. The receipts for property taxes paid by [the] Roberts introduced into evidence [ ] show that the Roberts paid property taxes on three (3) acres.

(Appellants' App. p. 21). Based on the findings, the trial court concluded the following:

24. [The] Roberts failed to prove actual, open, notorious, hostile and exclusive and adverse possession by [the] Roberts and their predecessors in interest for 10 years to establish ownership of the disputed land by [the] Roberts.

25. The land between the east-west center line, based on where the Palm surveys set the line, and the south line of the Feitz[es] real estate 20 feet south of the ditch is approximately 3.3 acres.

26. The land between the east-west center line, based on where the Lang–Feeney [& Associates] surveys set the line, and the south line of the Feitz[es] real estate 20 feet south of the ditch is approximately 3.9 acres.

27. For [the] Roberts to lay claim to the land 20 feet south of the ditch, they would have to have adverse possession of and pay the real estate taxes on the approximate 5.2 acres described in the legal description used in the Robertson to Beyler or Geyer to Geyer warranty deeds.

28. According to the tax statements and receipts for payment in evidence,

the Roberts have paid taxes only on 3 acres.

29. In order to establish title to the disputed land, [the] Roberts [were] required to prove that they had reasonable and good faith belief that they were paying taxes [on] land 20 feet south of the ditch for 10 years.

30. The Roberts cannot be seen to reasonably believe that they paid the taxes due on 5.2 acres of land when their tax statements and receipts for payment show that they paid taxes on only 3 acres of land. [ ]

(Appellants' App. pp. 30–31).

The Roberts focus on the tax requirement imposed by I.C. § 32–21–7–1 to contend that the only portion of the 5.2 acre parcel that was taxable was the dry land, which was roughly 3 acres and which included the Disputed Lane, and, thus, Papczynicski not only substantially, but fully complied with the statute. The Feitzes also focus on the issue of taxes paid on the Disputed Lane and whether the Roberts can claim adverse possession based upon that element, as does the trial court. However, the Roberts are also required to prove the four elements of adverse possession—control, intent, notice and duration—for a period of ten years. *Fraley*, 829 N.E.2d at 486; *Hoose*, 886 N.E.2d at 92. Instead, we will focus on the notice requirement and find that the Roberts did not satisfy that element.

The record demonstrates that the Roberts' use of the property started sometime after they acquired their property in 2002. Bob Feitz testified that he did not see evidence that anybody was occupying or making improvements on the Disputed Lane until the first incident which occurred sometime after the Roberts acquired their property. While mowing his grass, Bob observed a man who turned out to be a family friend of the Roberts fishing

at Fites Lake. Roughly three years later, Bob noticed that someone had installed a picnic table, fire pit, pier and a pitched tent on his property within the area 20 feet south of the ditch. He further testified that there was more unauthorized use of the lane to access Fites Lake, stating that "at one point there were four boats back there, one or two of them tied to my pier. I've seen vehicles back there blocking my access to my pier. Parties late at night, bonfires, some shooting incidents. Neighbors raising hell. Police were called out there numerous times." (Tr. p. 641). While it is clear that the Roberts and/or others were using the Feitzes' property without authorization, this unauthorized use began after the Roberts acquired their property in 2002, which is well under the statutory requirement for adverse possession.

### IV. *Prescriptive Easement*

Third, the Roberts claim that the trial erred when it determined that Papczynicski had not acquired a prescriptive easement over the Disputed Lane. Specifically, they argue that their "predecessors in title have used and controlled the property with the requisite intent and notice continuously since 1958, well beyond the 20 years required to establish a prescriptive easement." (Appellants' Br. p. 40).

Prescriptive easements are not favored in law, and in Indiana, the party claiming one must meet stringent requirements. *Corp. for Gen'l Trade v. Sears*, 780 N.E.2d 405, 410 (Ind.Ct.App.2002). In order to established the existence of a prescriptive easement, Indiana Code section 32–23–1–1 provides that "[t]he right-of-way, air, light, or other easement from, in, upon, or over land owned by a person may not be acquired by another person by adverse use unless the use is uninterrupted for at least twenty (20) years." Indiana

cases have also required that the evidence demonstrate an actual, hostile, open, notorious, continuous, uninterrupted, and adverse use for twenty (20) years under a claim of right, or such continuous, adverse use with knowledge and acquiescence of the owner. *Capps v. Abbott,* 897 N.E.2d 984, 988 (Ind.Ct.App.2008). An easement by necessity may arise, which requires "a severance of the unity of ownership of a tract of land in such a way as to leave one part without access to a public road." *Downing v. Owens,* 809 N.E.2d 444, 453 n. 11 (Ind.Ct.App.2004), *trans. denied.* Because the Roberts have not lived on the property for the statutorily required period, they must tack their use of the Disputed Lane on to the prior owners. *See Sears,* 780 N.E.2d at 410 (noting that twenty-year requirement may be satisfied by "tacking" present claimant's use of easement to continuous use by predecessors in title).

The trial court concluded, in relevant part:

32. In order to claim a prescriptive easement over [the] Feitz[es'] land, [the] Roberts must prove use and control of the land for 20 years. [ ]. The evidence presented does not prove use and control of the disputed land by [the] Roberts or their predecessors in interest for 20 years and that [the] Roberts and their predecessors in interest intended this use to be exclusive as against [the] Feitz[es] for the required time. [ ] The evidence at trial proves that [the] Feitz[es] exercised use and control over the property to the exclusion of Papczynicski by re-installing the fence that was 20 feet south of the ditch and moving and installing a gate on the access lane after [the] Feitz[es] acquired the land in 1992.[5] [The] Feitz[es] maintained the fence and gate even after

[the] Roberts started to use the disputed lane.

33. [The] Roberts have not sought permission [from] the Indiana Department of Environmental Management and the Army Corps of Engineers to fill-in any portion of the wetlands on their real estate to create access onto their property from Linden Road.

34. As such, the evidence presented by [the] Roberts at trial fails to demonstrate a prescriptive easement by necessity over the Feitz[es] real estate for ingress and egress to the Roberts property at the present time.

(Appellants' App. pp. 31–32).

In *Capps,* we addressed a similar problem. In that case, there was a disputed roadway between the Cappses and Abbotts properties. *Id.* at 985. The Cappses and Abbotts each acquired their properties, which were divided by a farm fence, in 1989. *Id.* Since the early 1970s, the Abbotts and their predecessors-in-title continuously used the roadway, which was the only route for ingress to and egress from their property. *Id.* In 2006, the Cappses hired a surveyor to survey their land, which contained inconsistencies with a previous survey and showed that the roadway had never been platted or turned over to the county, and thus was strictly a private access road. *Id.* at 986. As a result, the Cappses requested that the Abbotts no longer access their land by means of the roadway. *Id.* We held that the record established that the Abbotts' use of the roadway, as well as their predecessors-in-title, "constituted an open and continuous use of another's land with knowledge on the part of the owner for the required twenty years." *Id.* at 989. Thus, the Abbotts acquired prescriptive easement of the roadway. *Id.* at 990.

---

5. The Feitzes acquired the land in 1995. (Appellees' App. p. 43).

■ Unlike the Abbotts' continuous use of the disputed roadway, here, the Roberts failed to establish similar use of the roadway and property for a continuous 20 year period. As we discussed in the previous section and found that the Roberts did not satisfy the notice requirement for the ten year requirement, the Roberts use of the Disputed Lane is well under the twenty year statutory requirement for prescriptive easement.

■ Additionally, while the Roberts do not have an access off Linden Road onto their real estate because of the wetland area adjacent to Linden Road, the Roberts failed to prove an absolute necessity. *See Pardue v. Smith*, 875 N.E.2d 285, 291 (Ind.Ct.App.2007). During the trial, Bob Feitz stated that he obtained a permit from the Army Corps of Engineers, the Indiana Department of Environmental Management, and the Indiana Department of Natural Resources to fill in a portion of the wetlands on his property to create the drive area. The trial court found that at the time of litigation, the Roberts had not obtained the necessary permits required to fill-in any portion of the wetland on their real estate to create an access to their property from Linden Road. Nothing in the record indicates that the Roberts are prevented from obtaining permission. Thus, the Roberts have not demonstrated that use of the Feitzes' land is absolutely necessary in order to create an easement by necessity over the Disputed Lane.

### V. *Papczynicski's Acquiescence*

■ Finally, the Roberts contend that the trial court erred when it determined that Papczynicski had acquiesced to the Feitzes' south property line. Title by acquiescence is a doctrine that dates from around the turn of the twentieth century. *Huntington v. Riggs*, 862 N.E.2d 1263, 1267 (Ind.Ct.App.2007), *trans. denied.* In

*Huntington*, we defined this principal of law as follows:

As a general rule, it is affirmed by the authorities that where owners of adjoining premises establish by agreement a boundary or dividing line between their lands, take and hold possession of their respective tracts, and improve the same in accordance with such division, each party, in the absence of fraud, will thereafter be estopped from asserting that the line so agreed upon and established is not the true boundary line, although the period of time which has elapsed since such line was established and possession taken is less than the statutory period of limitation. The general rule recognized by the authorities is that a boundary line located under such circumstances, in the absence of fraud, becomes binding on the owners establishing it, not on the principle that the title to the lands can be passed by parol, but for the reason that such owners have agreed permanently upon the limits of their respective premises and have acted in respect to such line, and have been controlled thereby, and therefore will not thereafter be permitted to repudiate their acts.... A valid agreement between owners of land locating a boundary line between them is binding upon each and all persons claiming under or through them, or either of them.

*Id.* at 1267 (citing *Adams v. Betz*, 167 Ind. 161, 78 N.E. 649, 652 (1906)). The *Huntington* case involved a boundary line dispute between property owners who had treated a county road as the boundary line between their properties. *Id.* at 1265–66. However, the road did not coincide with the actual boundary line. *Id.* In our discussion, we stated that "[w]hen adjoining landowners agree to erect a fence as a legal boundary line, they are estopped from denying that this is the legal bound-

ary line." *Id.* at 1268, (citing *Freiburger v. Fry*, 439 N.E.2d 169, 171–172 (Ind.Ct.App. 1982)). We went on to clarify that statement with the following:

> The line agreement need not be express and may be inferred from the parties' actions, but there must be evidence of some agreement as to the boundary line. Use and improvement of the land up to the alleged boundary line may be sufficient to satisfy the requirement of an agreement if the adjoining landowner acquiesces. Ownership of the land in this manner vests in the parties even though the property has not been held for the statutory period required under a theory of adverse possession.

*Id.* (citing *Freiburger*, 439 N.E.2d at 172–73). We held that Huntington had acquired the disputed land prior to the Riggs' purchase of the property, as the boundary line agreement was binding not only the original owner, but also on the Riggs, and, as a result, the Riggs were estopped from disputing Huntington's ownership over the land. *Id.* at 1271. Thus, we reversed the trial court and entered summary judgment in favor of Huntington's ownership over the disputed land by acquiescence. *Id.* at 1270.

In the present case, the trial court found the following facts with respect to possible acquiescence:

> 70. Terry Lang found evidence of an old fence at the location he established to be the south line of the Feitz[es] real estate, approximately 20 feet south of the ditch. The fence is shown on the Lang–Feeney [& Associates] survey [ ] at the south boundary of the Feitz[es] real estate.
>
> 71. [Bob] Feitz replaced the fence at the south boundary line after he acquired the real estate. John Papczynicski owned the land to the south of the Feitz[es] real estate at the time and did not object to [Bob] Feitz replacing the fence at the south boundary of the Feitz[es] real estate.
>
> 72. When [the] Feitz[es] acquired the real estate [ ] Bob Feitz did not observe [ ] signs of use or occupancy of the land 20 feet south of the ditch. Feitz did not see a picnic table, fire pit, or pier placed on the Feitz[es] land by anyone else.
>
> 73. When [the] Feitz[es] acquired their real estate [ ] there was a gate across the lane at Linden Road. Bob Feitz removed the gate and installed a gate approximately two vehicle lengths further to the east so that a vehicle towing a boat would have room to turn completely off Linden Road onto the lane and stop in front of the gate to open it.

(Appellants' App. p. 21). Based on these findings, the trial court concluded that: "As noted above, Feitz exercised control over the property to the exclusion of [Papczynicski], and a fair reading of the contested evidence demonstrated by its preponderance that [Papczynicski] had acquiesced to the boundary and Feitz acted in reliance on that acquiescence." (Appellants' App. p. 33).

The record demonstrates that shortly after the Feitzes purchased the land in 1995, Bob installed a new fence at the south property line 20 feet south of the Heston ditch. The new fence was in "exactly the same row" as the prior fence where the Lang–Feeney & Associates surveys placed the south property line. (Tr. p. 639). Bob testified that when he spoke to Papczynicski about the property, he had never received any notice or objection from Papczynicski or anyone else as to where he placed the fence. Bob also testified that they were not aware of any claims against the property and no one had made any claims until the day the Roberts placed a "for sale sign" in front of the Disputed Lane. (Tr. p. 645).

The Feitzes acted in reliance on Papczynicski's acquiescence of the boundary line and as a result, they made improvements to the land. For example, when the Feitzes acquired the property, the Disputed Lane had not been developed and would often fill with water when it rained. The area had been covered with tall weeds and had not been maintained. Essentially, the land could not be used by vehicles and was only used as a walking lane. Bob improved the lane by installing tiles and dirt to build up the lane, allowing vehicles to access the lake. He removed an old gate that was located at the edge of Linden Road and installed a new gate approximately two vehicle lengths further to the east so that a vehicle towing a boat would have room to turn completely off Linden Road onto the lane and stop in front of the gate to open it. Additionally, he also posted a "no trespassing sign" on the gate. (Tr. p. 626). Because Papczynicski agreed on the boundary line between his property and what would become the Feitzes property, that agreement is binding on the Roberts and all others who subsequently acquire the land from them. *Huntington*, 862 N.E.2d at 1267.

### CONCLUSION

Based on the foregoing, we conclude that the trial court properly determined that (1) the Feitzes had a superior title; (2) the Roberts had not acquired the Disputed Lane by adverse possession; (3) the Roberts had not acquired the Disputed Lane by prescriptive easement; and (4) Papczynicski had acquiesced to the Feitzes' south property line.

Affirmed.

MATHIAS, J., and BRADFORD, J., concur.